**COMMONWEALTH of Kentucky NAT-URAL RESOURCES AND ENVI-RONMENTAL PROTECTION CABI-NET, Appellant,**

v.

**KENTEC COAL CO., INC. Appellee.**

No. 2003–SC–000622–DG.

Supreme Court of Kentucky.

Sept. 22, 2005.

Rehearing Denied Dec. 22, 2005.

Jennifer Cable Smock, Office of Legal Services, Frankfort, KY, Counsel for Appellant.

Donald Duff, Frankfort, KY, Counsel for Appellee.

SCOTT, Justice.

We granted Discretionary Review of the Opinion of the Court of Appeals, which held KRS 350.0301(5) and 405 KAR 7:092, Section 6, unconstitutional, as in violation of the due process and equal protection clauses of the United States Constitution, as well as Section 2 of the Kentucky Constitution, banning arbitrary state action. Upon our considerations hereinafter set out, we affirm.

The Appellee, Kentec Coal Company, Inc. (KENTEC) is the holder of a surface mining permit located in Leslie and Perry Counties. The permit totals some 107 acres and is divided up into six (6) separate geographical increments for incremental bonding purposes. The permit was issued in 1987 and expired on December 1, 1992, although reclamation work was continuing in accordance with the permit obligations, per an agreed order between the parties.

KENTEC was owned by Mr. John Siegal, who apparently kept KENTEC's main offices in Louisville, Kentucky. Mr. Brim Watts was the overseer for KENTEC's reclamation work on the permit site. The reclamation inspector on the job site for the Environmental and Public Protection Cabinet (CABINET) was Lisa Baker (BAKER).

On May 30, 1996, inspector BAKER observed a disturbance on the permit site which appeared to be preliminary excavation of a basement or houseseat for a residential dwelling. Throughout the enforcement, and even on appeal, there has been some confusion as to just which increment was involved. Initially inspector BAKER felt the disturbance was on increment 5; yet cabinet office personnel believed it was on increment 1. The Appellee, at oral arguments, suggested the disturbance (would or did) straddle both increments 1 and 5. Increment 1 covers 17.2 acres of surface reclamation responsibilities, whereas increment 5 covers 24.44 acres.[1] The post mining land use for increment 5 is forest land. For increment 1, it is hayland and pasture.

On this date, inspector BAKER issued KENTEC a mine inspection report (MIR) noting "[t]hird party disturbance has been made on the site. Building construction has started. Submit permit revision reflecting any post-mining land use change **which will result.**"

In July 1996, inspector BAKER met with KENTEC's engineer, as well as Mr. Watts. The fact that a house was being built on the mine site was discussed at that meeting. It became apparent that Bruce Leedy (the former surface owner) had sold a portion, or all, of increment 5 to Mr. Kenneth Bowling and Mr. Bowling was building a house on his property. Bowling was noted to have said that he was not sure how much of the property would be devoted to the house and there was a possibility he, or his son, might build another house, as well as associated outbuildings such as a garage, etc. Later, even areas for gardens were noted.

At any rate, inspector BAKER continued to inspect the permit from June through November 1996. On her inspection of November 22, 1996, she issued KENTEC a Non–Compliance, noting that there was a house under construction on the permit and that KENTEC had failed to revise the permit to incorporate a change in its approved post mining land use for that area. As a result, KENTEC was directed to "submit and obtain a revision to permit to allow change in post mining land use" by December 22, 1996.

No revision having been submitted by KENTEC by December 27, 1996, inspec-

---

1. At oral arguments, counsel for the CABINET, suggested the way to ensure that the post mining land use on the area of disturbance was properly included in the revision, was to revise the post mining land use for the whole increment within which the disturbance occurred, or is occurring. However, the record and arguments did not provide us with the revision costs, or the reclamation costs for this change to either increments 1, 5 or both, as opposed to just the smaller area of disturbance, the extent of which had yet to be determined.

tor BAKER issued a Cessation Order noting that the remedial work had not been completed.

Mr. Watts, KENTEC's reclamation manager, did not know of the issuance of the Cessation Order as the paperwork had been sent to KENTEC's owner Mr. John Siegal. Apparently Siegal did not notify Watts of such. Watts testified, however, that he did not have their engineers working on the revision because he wasn't sure of what would eventually be involved. He had tried to find out from Mr. Bowling exactly what he intended to do and tried to ascertain the location of the property affected by the sale, but apparently the Deed from Mr. Leedy to Mr. Bowling wasn't on record. However, Mr. Bowling did claim his property encompassed the entire watershed, even extending outside of the permit. He also told Mr. Watts that he, or his son, might build another house on the property. As of March 1997, Watts was of the opinion the house had not been finished as Mr. Bowling was still living in a trailer adjacent to the house. In Watts' opinion, the project was still on-going and there was no practical need for KENTEC to submit a revision until the extent of the ultimate disturbance could be ascertained.

The CABINET does not dispute that KENTEC did not have any association with Mr. Bowling, or that Mr. Bowling was not subject to the control of KENTEC. Neither did KENTEC authorize Mr. Bowling to construct a house on his property within its permit.

For one of KENTEC's defenses, it relied on the applicability of the CABINET'S so-called "Third Party Violation Policy" along with a memorandum issued in relation thereto, by the CABINET'S assistant director of the Division of Field Services, David Nance, on May 2, 1991; all of which was a clarification of a policy originally enunciated by the Federal Office of Surface Mining (OSM). According to Nance, OSM's policy was a result of a series of discussions between OSM and the Department of Surface Mining Reclamation and Enforcement (DSMRE) concerning the problems associated with disturbances caused by third parties unrelated to the permittee or mining company. Ultimately OSM issued a letter on April 19, 1990, addressed to Kentucky's Commissioner stating that OSM (in its oversight position) would not issue a 10–day notice for violations caused by third parties, if the area disturbed by a third party had not been previously disturbed by the permittee. Thereafter, on May 2, 1991, Nance issued the policy clarification memorandum pointing out that "third party disturbances" might entail an on-going process, the extent of which might not be known until it was completed. Consequently, he observed that "the permittee and the inspector should monitor the third party activity, and only when the activity is completed should any deadline (for corrections) be set." Nance summed up this policy directive by stating "[o]ne should try to approach 'third party situations' with common sense. A violation should not be written prior to the permittee being able to do anything." For purposes of this case, this policy was still in effect and had not been rescinded.

The reasons behind the later CABINET clarification were apparently related to the CABINET workload. Due to previous literal applications of the OSM policy, many permittees were submitting permit revisions within thirty (30) days of the first notice of disturbance. Many of the disturbances were caused by oil and gas pipeline companies constructing pipeline right-of-ways over multiple permit increments, resulting in multiple filings (as the right-of-way progressed from area to area over time) to revise each new disturbance, area

or increment affected by the surface disturbance. Thus, Nance's memorandum was intended to give the inspector more flexibility in dealing with third party disturbances by allowing the permittee and the inspector jointly to take a "wait and see" approach in order to determine just what the ultimate extent of the disturbance would be at the end of the construction. Once the totality of the disturbance was ascertained, the permittee would then submit a comprehensive permit revision.

However, based upon the issuance of the Cessation Order on December 27, 1996, the CABINET then issued KENTEC a "Notice of Proposed Assessment" for the violations in the amount of $29,700.00.[2] At this point, the procedural aspects of this case become important.

Once a Cessation Order is issued and the Notice of Proposed Assessment is given, the administrative hearing procedures for mine operations (permittees) becomes bifurcated under the CABINET's regulations. See KRS 350.0301(5).

405 KAR 7:092, Section 6, provides that any person issued a proposed penalty assessment may file a petition for **review of the proposed assessment** within thirty (30) days of the receipt of the proposed assessment or the mailing of the conference officer's report. A parallel process exists under 405 KAR 7:092, Section 7, which allows an operator to have a formal review of any **fact-of-violation**. However, these are two (2) separate (parallel) administrative procedures, one based upon the **assessment amount** while the other is based upon the **question of whether there was in fact, a violation.**

KENTEC pursued both avenues, lost each; and appealed each to the Franklin Circuit Court, where they were consolidated. On November 6, 2001, the Franklin Circuit Court entered Judgment in the consolidated actions, overruling KENTEC's positions and affirming the decisions of the CABINET. A subsequent Motion to Alter and Amend was denied on May 9, 2002.

KENTEC then appealed to the Court of Appeals which reversed the Order and Decisions of the CABINET and the Franklin Circuit Court. We granted Discretionary Review on Motion of the CABINET.

### THE ADMINISTRATIVE PROCEDURES

In *Franklin v. Natural Resources and Environmental Protection Cabinet*, 799 S.W.2d 1 (Ky.1990), we found a similar CABINET hearing procedure unconstitutional, wherein we held, "this regulation which denies the due process hearing to an aggrieved party based solely on his financial inability to pay the penalties which he seeks to appeal is unconstitutional, in violation of the equal protection clauses of the United States and Kentucky Constitutions." *Id.* at p. 3. Following *Franklin,* the General Assembly then amended Chapter 350 of the Kentucky Revised Statutes to add the current version of KRS 350.0301(5), which allows for the parallel hearing procedures discussed previous. Yet, KRS 350.0301(5) still includes a requirement of prepayment of penalties for hearings contesting the **amount of the penalty—but not the "fact-of-violation" hearings.**

Pursuant to the authority then established in KRS 350.0301, 350.028 and 350.465(3)(i), the CABINET promulgated

---

**2.** 7,200.00 of the assessment represented an assessment for the Non–Compliance. The remaining $22,500.00 was assessed for the Cessation Order, which has a statutory minimum of $750.00 for each day the Cessation Order remains unabated. This amount is mandated by KRS 350.990(1).

405 KAR 7:092. Section 3 of 405 KAR 7:092, sets forth the requirements for the proposed penalty assessment and the options the permittee has following the issuance of a "Notice of Proposed Assessment." Section 4 recites the procedures for the informal assessment conference, a permittee may utilize to contest the assessment without having to prepay. However, this is not a formal recorded proceeding; nor is a record created from which an Appeal on record may be taken. Moreover, in this conference, the CABINET selects the conference officer to handle the conference. 405 KAR 7:091, Section 10. In particular, 405 KAR 7:092, Section 4(3) states: "The assessment conference **shall not be governed by** the requirements for administrative hearings [405 KAR 7:091, Section 3] or by the provision of 400 KAR 1:040," [3] Section 6 outlines the procedures that must be followed by the permittee **to obtain a formal hearing** to challenge an assessment, **and requires the prepayment of the assessment as proposed,** or if an assessment conference has been held, prepayment of the penalty recommended by the conference officer. **Section 7 allows permittees to challenge the Issuance of a Non–Compliance or Cessation Order in a formal hearing without a prepayment (the fact-of-violation hearing).**

Upon prepayment of the pending assessment under Section 6, the formal penalty hearing is de novo and on the record. Finally, Section 15 **allows individuals** (but not corporations), the opportunity to prove their inability to prepay the proposed assessment and to obtain a waiver from the prepayment requirements of Section 6.[4] According to the CABINET, the prepayment requirement for corporations is nec-

essary to assist in the collection of corporate fines and penalties, while the waiver for individuals is predicated on their potential need for necessary living expenses.

As a result of the proposed assessment, KENTEC filed a request for an informal Assessment Conference pursuant to 405 KAR 7:092, Section 4. An assessment conference was scheduled for April 17, 1997; however, KENTEC did not attend and the conference officer entered a report and recommendation on May 22, 1997, recommending the Secretary enter an Order upholding the assessment as proposed. The conference report gave notice that KENTEC could request a formal administrative hearing by filing a Petition accompanied by full payment of the proposed assessment.

KENTEC did file a Petition for Hearing on the proposed assessment by June 19, 1997. However, in its Petition KENTEC stated "it **did not have sufficient funds to prepay the proposed assessment.**" Thus, the CABINET filed a Motion to Dismiss KENTEC's Petition for reasons the prepayment was not attached. The CABINET's Motion noted the waiver of prepayment provisions did not apply to KENTEC, since it was a corporation. Thus, the hearing officer recommended dismissal of KENTEC's timely Petition on ground of failure of prepayment to which KENTEC filed exceptions. An Order dismissing KENTEC's Petition and affirming the penalty was entered by the Secretary on July 28, 1998.

KENTEC also petitioned for "temporary relief" from the Non–Compliance and Cessation Order on June 27, 1997, and a hearing officer—different than the one as-

---

**3.** 400 KAR 1:040 would ordinarily allow pre-hearing discovery between the parties. No such right exists for this informal conference.

**4.** This is consistent with the Federal scheme under the Surface Mining Control and Reclamation Act; See, 30 USC § 1268, 30 CFR § 723.19 and § 845.19, 43 CFR § 4.1152.

signed to hear the fact-of-violation case—granted temporary relief from the violation. This temporary relief order abating the violation was effective until the Secretary's Order was entered on April 1, 1998, in the formal "fact-of-violation" case, denying KENTEC relief and upholding the issuance of the violation and the Cessation Order.

### CONSTITUTIONALITY OF KRS 350.0301(5) & 405 KAR 7:092, SECTION 6 AND SECTION 15

Based upon KRS 350.0301(5), 405 KAR 7:092, Section 6(2)(b) requires the Petition to "be accompanied by full payment of the proposed penalty assessment" which is to be placed in an escrow account pending final determination of the assessment. 405 KAR 7:092, Section 15 allows for a waiver of the prepayment of the proposed penalty for individuals. The waiver is not available for corporate permittees, notwithstanding that the General Assembly has vested in corporations, "the same power as an individual to do all things necessary or convenient to carry out its business and affairs..." KRS 271B.3–020(1).

In reviewing the "parallel procedures" which the General Assembly enacted after *Franklin, supra*—one procedure with formal evidentiary hearings on the record to contest the fact of the violation, but another requiring prepayment prior to the formal evidentiary hearing to contest the penalty—we note the wisdom in the Court of Appeals' comment that "as a practical matter, the amount or propriety of the penalty imposed could be as critical as or perhaps even more weighty, than the fact of the violation itself." [5]

█ With this in mind, we are not unmindful of the rule of construction in constitutional considerations, that "[w]hen the constitutionality of a statute is challenged, the court should try not to destroy it, but to construe it, if consistent with the will of the legislature, so as to comport with constitutional limitations." *United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 571, 93 S.Ct. 2880, 2893, 37 L.Ed.2d 796 (1973). However, hard as we may try, we cannot construe the word corporation as an "individual" as specifically referenced in KRS 350.0301(5).

█ Section 2 of the Kentucky Constitution provides the Commonwealth shall be free of arbitrary action. With respect to adjudications, whether judicial or administrative, this guarantee is generally understood as a due process provision whereby Kentucky citizens may be assured of fundamentally fair and unbiased procedures. *Smith v. O'Dea*, 939 S.W.2d 353 (Ky.App.1997). As noted in *Pritchett v. Marshall*, 375 S.W.2d 253 (Ky.1963), the state is enjoined against arbitrariness by Section 2 of the Kentucky Constitution which, we have held is "a concept we consider broad enough to embrace both due process and equal protection of the laws, both fundamental fairness and impartiality." *Id.* at p. 253.

### EQUAL PROTECTION

█ The standards for equal protection in Kentucky are well set out in *D.F. v. Codell*, 127 S.W.3d 571 (Ky.2003), wherein we stated: "Sections 1, 2 and 3 of the Kentucky Constitution provide Kentuckians with the rights of equal protection under the Kentucky Constitution. *Commonwealth v. Howard*, 969 S.W.2d 700 (Ky.1998). This clause applies to all governmental activity, whether legislative, executive, or judicial.... *Willowbrook v. Olech*, 528 U.S. 562, 120 S.Ct. 1073, 145

---

5. Court of Appeals opinion, page 6.

L.Ed.2d 1060 (2000). This is consistent with the simple goal of the equal protection clause to '[k]eep governmental decision makers from treating differently persons who are in all relevant respects alike.' *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992). But, as a practical matter, nearly all legislation differentiates in some manner between different classes of persons and the Equal Protection Clause does not forbid such classification per se. *Romer v. Evans*, 517 U.S. 620, 631, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996). The level of judicial scrutiny applied to such challenges depends on the classification made in the statute and the interest affected by it." See *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 253, 94 S.Ct. 1076, 1079 39 L.Ed.2d 306, 312 (1974).

■ "Currently, there are three levels of review, rational basis, strict scrutiny, and the seldom used intermediate scrutiny, which falls somewhere between the other two. See *Steven Lee Enterprises v. Varney*, 36 S.W.3d 391, 394–95 (Ky.2000). Where the statute merely affects social or economic policy, it is subject only to a 'rational basis' analysis." *Steven Lee Enterprises*, 36 S.W.3d at 394. Under this standard of review "legislative distinctions...must bear a rational relationship to a legitimate state end." *Chapman v. Gorman*, 839 S.W.2d 232, 239 (Ky.1992).

■ Thus, since the distinction is allegedly based upon economics, the discriminatory distinction contained in KRS 350.0301(5) and its implementing regulations, 405 KAR 7:09(6) and (15) can survive only if it bears a rational relationship to a legitimate state end. The distinction being one between "individuals" and "corporations," the "legitimate state interest" is said to be, (1) that it facilitates the col-

lection of fines and penalties from corporations and (2) the individual "waiver" provisions recognize that individuals have necessary living expenses, while corporations do not.

This having been said, KENTEC, which plead "its inability to make the prepayment," is deprived of a right to a due process hearing, while the hearing is secured to a corporation that can afford it, and even an indigent individual who has the means of securing a waiver. Like the Court of Appeals before us, we too have been unable "to discern any rational basis or legitimate state interest to explain— much less to justify— the arbitrary singling out of a corporation for such disparate treatment." [6]

■ Thus, it is still our opinion, that a process "which denies a 'due process hearing' to an aggrieved party based solely on its financial inability to pay the penalties which he seeks to appeal is unconstitutional, in violation of the equal protection clauses of both the United States and the Kentucky Constitutions." *Franklin, supra*, p. 4.

■ In stating our position, we do not ignore the multitude of federal cases cited by the CABINET; we simply disagree with their holdings as we did in 1990, when we decided *Franklin*. Decisions of the lower federal courts are not conclusive as to state courts, *Steenbergen v. Commonwealth*, 532 S.W.2d 766 (Ky.1976) and *Bell v. Commonwealth*, 566 S.W.2d 785 (Ky. App.1978). It is just not within our democratic ideas, customs or maxims to grant equal justice and due process only to those who can afford to pay and to deny such rights to those who cannot. Such a notion flies in the face of the belief of "equal justice under the law." KENTEC, in its

---

6. Court of Appeals opinion, page 7.

Petition for a hearing on the amount of the assessment plainly said "it could not afford to prepay the assessment." However, no process was allowed it to prove the fact plead and no relief was afforded it had it been able to do so.

In Kentucky we remain committed to an Administrative process which guarantees the right to a formal due process hearing for aggrieved parties without regard to their financial inability to pay. Notwithstanding the protestations of the CABINET, we cannot discern any rational basis, or legitimate state interest, to explain—much less justify—the arbitrary singling out of a corporation for such disparate treatment [7].

"There is no attempt to classify corporate permittees differently from individuals anywhere else in the statute, or regulation, for any other purposes other than the grace of this waver exception." *Kentec Coal Co. v. Commonwealth of Kentucky*, 2003 WL 21714582[8]

### ABSOLUTE AND ARBITRARY POWER

"Section 2 of our Bill of Rights is unique, only the Constitution in Wyoming having a like declaration.... Section 2 of our Constitution reads: 'absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority....' So it may be said that whatever is contrary to democratic ideas, customs and maxims is arbitrary. Likewise, whatever is essentially unjust and unequal or exceeds the reasonable and legitimate interests of the people is arbitrary." *Sanitation District of Jefferson County v.*

*Louisville,* 213 S.W.2d 995, 308 Ky. 368 (Ky.1948)

"Unequal enforcement of the law, if it rises to the level of a conscious violation of the principle of uniformity, is prohibited by this section." *Kentucky Milk Marketing v. Kroger Company,* 691 S.W.2d 893, 899 (Ky.1985). The question of reasonableness is one of degree and must be based on the facts of a particular case. *Boyle County Stockyards Company v. Commonwealth,* 570 S.W.2d 650, 654 (Ky.App.1978).

Third party disturbances have been a thorn in the side of the mining industry, and the regulatory agencies, since the advent of surface mining regulation. To date, no practical solution for the problem has been acceptable to all the parties involved in the regulatory scheme; albeit, the "wait and see policy," if properly implemented, is the best on the block at the moment. An attempt by the General Assembly through KRS 350.093(9), to create a framework to resolve the problem did not meet the approval of OSM as it was less restrictive than the federal requirements pursuant to 30 USC § 1255, et. seq. The "wait and see" approach thus resulted.

Under the current surface mining regulatory scheme, a third party disturbance constitutes a violation against the permittee who, in this instance, admittedly has no right, or recourse, for the occurrence of the third party building his home on his own property. Thus, the occurrence, whenever cited, is a violation which is generally uncontestable. The parallel policy of a hearing on the "fact of violation" is,

---

7. It would be interesting to see the statistics on the number of mining corporations regulated by the CABINET today versus the number of individuals actually regulated by it as operators or permittees.

8. Court of Appeals opinion, page 7.

thus, of no consequence, or assistance, to the permittee. The critical avenue of the appeal then is the assessment, which in this instance is unavailable, simply because the permittee cannot afford to post the fine it wishes to contest.

While we do not (in light of its "wait and see policy") criticize the CABINET's action in this regard [9], we can, and do hold, the CABINET's assessment of a penalty without access to a subsequent formal hearing based upon a permittee's inability to pay was unreasonable and arbitrary and in violation of Section 2 of the Kentucky Constitution. In addition, given the minimum four (4) weeks advertising required for a major revision after submission, not to mention the time consumed by correspondence and corrections from the office of permits, it was impossible for KENTEC to "obtain" a permit revision by December 22, 1996—as required by the citation. Obviously it could have filed one—but it could not have "obtained" one within that time, unless it was guaranteed extensions on the deadline, which are essentially discretionary with the CABINET. See 405 KAR 5:085, Section, 3(4) and Section, 4(4).

Thus, we reaffirm our prior holding in *Franklin* and to this extent affirm the Court of Appeals. This matter is now remanded to the Environmental and Public Protection Cabinet for a formal hearing

in review of the purposed assessment consistent with this opinion.

LAMBERT, C.J.; GRAVES, and WINTERSHEIMER, JJ., concur.

COOPER, J., concurs in part and dissents in part by separate opinion with Johnstone and ROACH, JJ., joining that opinion.

ROACH, J., dissents by separate opinion with COOPER and JOHNSTONE, JJ., joining that opinion.

Opinion by Justice COOPER, concurring in part and dissenting in part.

From reading the majority opinion, one might suspect that the Natural Resources and Environmental Protection Cabinet was regulating the Little Sisters of the Poor instead of Kentec Coal Company, which apparently is part of a conglomerate of corporations engaged in the business of strip-mining coal.[1] I dissent from the majority opinion because (1) Kentec's present difficulties are traceable to its own refusal to respond to six Mine Inspection Reports (MIRs), a Non–Compliance Notice, and a Cessation Order issued by the Cabinet, and its failure to attend an assessment conference which Kentec, itself, requested (and which did not require prepayment of the proposed penalty

---

**9.** It seems however that it would be more prudent and cost effective to utilize the "Wait and See policy" until the parameters of the disturbance were known and then limit the revision/post mining land use change to the actual area of expected disturbance, rather than the larger existing increment boundary, as long as environmental damage and safety are not in question. However, we acknowledge the CABINET's need to insist on operator compliance and cooperation.

**1.** The administrative record in this case reflects that Kentec's address is 1534 Starks Bldg., Louisville, Ky., the same address as Puma Energy Corp., and that John J. Siegel,

Jr., is the president of Kentec and the Chief Executive Officer of Puma. By Agreed Order of May 29, 1992, executed by Siegel, Puma also assumed the reclamation permit of Flaget Fuel, Inc., and specifically represented that it had the power and authority to act on behalf of Kentec, Flaget, and another permittee, Shiva Coal, Inc. In the Order, Puma agreed to pay fines totaling $67,620.00 for permit violations attributed to Flaget and fines totaling $71,000.00 for permit violations attributed to Kentec (violations pertaining to the same reclamation permit that is the subject of this appeal).

assessment); (2) Kentec has no standing to attack the constitutionality of the statutes and regulations at issue; and (3) Kentucky's statutory and regulatory scheme, which substantially mirrors the Federal Surface Mining Control and Reclamation Act (SMCRA), is not unconstitutional. I would note at the outset that KRS 350.028 provides, *inter alia*, as follows:

> The Natural Resources and Environmental Protection Cabinet shall have and exercise the following authority and powers:
>
> . . .
>
> (5) *To adopt administrative regulations to allow the state to administer and enforce the initial and permanent regulatory programs of Public Law 95–87, "Surface Mining Control and Reclamation Act of 1977."* Administrative regulations shall be no more stringent than required by that law. Nothing in this chapter shall be construed as superseding, amending, modifying, or repealing any of the acts listed in Section 702(a) of Public Law 95–87, or any administrative regulation promulgated thereunder.

(Emphasis added.)

To fully understand Kentucky's present regulatory scheme, we must first examine *Franklin v. Natural Resources and Environmental Protection Cabinet,* 799 S.W.2d 1 (Ky.1990), in which this Court struck down portions of the previous regulatory scheme as unconstitutional. The statutes and regulations in place when *Franklin* was decided provided that after the Cabinet issued a Notice of Non–Compliance and Order for Remedial Measures to a permittee, there would be an informal initial hearing in the nature of a settlement conference. Thereafter, the permittee

could request a formal hearing with respect to both the fact of violation and the proposed penalty assessment; but the applicable regulation, 405 KAR 7:090 § 4, required prepayment of the proposed penalty assessment before the right to a formal hearing could be exercised on either issue. *Franklin* held the regulation requiring prepayment to be invalid because (1) the enabling statutes, KRS 224.083 and KRS 350.028, did not require prepayment of the proposed penalty assessment as a prerequisite to entitlement to a formal hearing, *id.* at 3 (citing KRS 13A.120(1)(i) [now KRS 13A.120(2)(i) ] (administrative agency cannot promulgate regulations which modify or vitiate a statute or its intent)); (2) the regulatory scheme was more stringent than the federal scheme, which provided an initial emergency public hearing on the fact of violation without requiring prepayment of the proposed penalty assessment, *id.* (citing KRS 13A.120(1) (when regulations are required by federal law, they shall be no more stringent than federal law or regulations [2])); and (3) 405 KAR 7:090 § 4 violated the Equal Protection Clauses of both the United States and Kentucky Constitutions because it denied a permittee the right to a due process hearing based solely on his inability to prepay the penalties. *Id.* at 3–4.

*Franklin* was rendered on September 6, 1990, and rehearing was denied on December 27, 1990. At that time, the General Assembly met only in even-numbered years. Ky. Const. § 36 (prior to 2000 amendment). In 1992, the General Assembly revised the statutory scheme to comply with *Franklin.* 1992 Ky. Acts, ch. 304. Specifically, KRS 350.0301(5) now authorizes the Cabinet to promulgate administrative regulations establishing both formal

---

2. *See also* KRS 350.028(5), *supra,* which has been on the books with substantially the same language since 1978. 1978 Ky. Acts, ch. 330, § 15(5).

and informal hearing procedures and to require prepayment of proposed civil penalty assessments into an escrow account *prior to a formal administrative hearing on the amount of the assessment.* KRS 350.0301(5) further provides for a waiver of prepayment "for those *individuals who demonstrate with substantial evidence an inability to pay* the proposed civil penalties into escrow." (Emphasis added.)

The Cabinet then promulgated 405 KAR 7:092, which provides numerous remedies for an "aggrieved" permittee. Section 4 provides for an informal assessment conference at which the permittee may show why the amount of the proposed penalty assessment should be reduced. No prepayment is required before this conference is held. Sections 6 and 7 allow the permittee to request formal administrative hearings with respect to both the proposed assessment and the fact of violation. To obtain formal administrative review of the proposed assessment, the permittee must pay the amount of the proposed assessment into escrow, *id.* § 6(2)(b) and (c), unless the permittee is an *individual* who produces proof that he is indigent and cannot make the payment. *Id.* § 15. However, *any permittee* can obtain formal administrative review of the fact of violation without prepaying the proposed assessment, *id.* § 3(4)(c); and payment of the assessment is abated until and unless the fact of violation is affirmed. *Id.* § 3(4)(a)3.

## I. KENTEC'S DERELICTION.

From May 1996 through November 1996, the Cabinet's reclamation inspector issued six MIRs to Kentec notifying it of its need to revise its reclamation permit to reflect that a residence was being constructed on property that had previously been designated for reclamation as forestry. Kentec did not respond to any of these MIRs. On November 22, 1996, the inspector issued a Notice of Non–Compliance for failure to take action to revise the permit. Again, Kentec did not respond. On December 27, 1996, a Cessation Order was entered. Again, Kentec did not respond. On January 24, 1997, Kentec, by counsel, filed a petition for review of the fact of violation. On February 12, 1997, the Cabinet served Kentec with a Notice of Proposed Assessment in the amount of $29,700.00, representing $7,200.00 for the noncompliance and $22,500.00 for failure to abate the violation listed in the Cessation Order (the statutory minimum of $750.00 per day for a maximum of thirty days, per KRS 350.990(1)). However, because it had filed a petition for review of the fact of violation, Kentec had no immediate obligation to pay the assessment. 405 KAR 7:092 § 3(4)(a)3.

On February 21, 1997, Kentec, by counsel, filed a request for an assessment conference. 405 KAR 7:092 § 3(4)(b). The Cabinet appointed an assessment conference officer who scheduled the assessment conference for April 17, 1997. When Kentec failed to appear at the conference, the officer, as required by 405 KAR 7:092 § 4(7), issued a report recommending that the Secretary of the Cabinet impose the proposed penalty assessment. On June 19, 1997, Kentec, through counsel, filed a petition for a formal administrative review of the proposed assessment. 405 KAR 7:092 § 6(1). However, it did not prepay the proposed penalty assessment as required by KRS 350.0301(5) and 405 KAR 7:092 § 6(2)(b). Instead, the unverified petition contained the following statement:

> Petitioner does not have sufficient funds by which to pay this large and excessive proposed assessment. Further the terms and conditions of Section 15 of 405 KAR 7:092 for obtaining a waiver of the prepayment requirement are so strict

and unreasonable *as to preclude Petitioner's qualification* for use thereof. (Emphasis added.) The emphasized language in Kentec's petition is, of course, essentially an admission that Kentec could not qualify for the waiver even if it were an individual instead of a corporation. 405 KAR 7:092 § 15 provides in pertinent part:

Section 15. Determinations as to Inability to Prepay.

(1) Inability to pay. Notwithstanding the provisions of Section 6(2) of this administrative regulation, *an individual,* upon filing a petition for review pursuant to Section 6 of this administrative regulation, may, in lieu of paying into the cabinet's escrow account the amount of the proposed assessment, *simultaneously submit a petition and affidavit* requesting the office to accord the individual a waiver of the requirement to prepay.

(2) Contents of petition. The petition for waiver of prepayment requirements shall set forth:

(a) A statement of facts underlying the request for a determination that the individual is unable to comply with Section 6(2) of this administrative regulation; and

(b) An affidavit, subject to penalties for perjury, setting forth the applicant's income, property owned, outstanding obligations, the number and age of dependents, and a copy of his most recent Kentucky and federal income tax returns.

. . .

(4) Interim report. Within thirty (30) days of filing of the petition, the hearing officer shall issue an interim report accepting or denying the petition for waiver. If the waiver is accepted, it shall be so noted in the record and shall remain in effect, subject to review upon proper motion. . . .

(5) Presumptions.

(a) It shall be prima facie evidence that the individual is unable to comply with Section 6(2) of this administrative regulation if the petition is accompanied by a certified copy of a petition for bankruptcy or the individual is receiving or is eligible to receive public assistance payments at the time a petition for waiver is filed.

(b) It shall be prima facie evidence a person is not eligible for a waiver if he owns real property; is not receiving, or is not eligible to receive, public assistance payments at the time the affidavit is submitted; or owns more than one (1) motor vehicle.

(Emphasis added.)

In addition to ignoring the six MIRs, the Notice of Non–Compliance, the Cessation Order, the assessment conference, and the requirements of Section 15 of 405 KAR 7:092, Kentec has yet to present one shred of evidence that it is indigent or otherwise unable to prepay the proposed penalty assessment in order to obtain formal review of the amount of the assessment. Nor has it offered any proof that it would qualify for a waiver under Section 15 of the regulation even if it were an individual instead of a corporation.

Nevertheless, because Kentec was entitled to an administrative hearing regarding the fact of violation, payment of the proposed assessment was abated until resolution of that issue. 405 KAR 7:092 § (3)(4)(a)3. A two-day formal hearing was held on that issue on July 16–17, 1997, at which Kentec was represented by counsel. On April 1, 1998, the Secretary of the Cabinet affirmed the fact of violation and entered an order imposing the proposed penalty assessment. The ensuing seven

years have been consumed by judicial appeals.

## II. CONSTITUTIONALITY OF THE PREPAYMENT REQUIREMENT.

Today's majority opinion has held two separate elements of Kentucky's surface mining regulatory scheme to be unconstitutional under the Equal Protection Clause of the United States Constitution and the equal protection principles embodied within Section 3 of the Constitution of Kentucky. The first, contained in KRS 350.0301(5) and 405 KAR 7:092 § 6, requires a permittee seeking a formal administrative hearing on the amount of a proposed penalty assessment to prepay the amount of the proposed assessment. According to the majority, this requirement unconstitutionally discriminates between corporations that are able to prepay the amount of the proposed assessment and those that are not.

### A. Standing to Claim an Equal Protection Violation.

It is fundamental that the existence of standing is a prerequisite to any equal protection challenge. *See, e.g., United States v. Hays,* 515 U.S. 737, 742–45, 115 S.Ct. 2431, 2435–36, 132 L.Ed.2d 635 (1995); *Northeastern Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 663–64, 113 S.Ct. 2297, 2302, 124 L.Ed.2d 586 (1993); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 260–61, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977); *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). *See also Associated Indus. of Ky. v. Commonwealth,* 912 S.W.2d 947, 950–51 (Ky. 1995) (First Amendment challenges to portions of Kentucky code of legislative ethics and executive branch code of ethics were properly dismissed where the com-

plaining party lacked standing). The standing inquiry is essential to ensure that the complaining party has "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). *See also Larson v. Valente,* 456 U.S. 228, 238–39, 102 S.Ct. 1673, 1680, 72 L.Ed.2d 33 (1982). Standing, at its "irreducible minimum," is composed of three well-settled requirements. *Northeastern Fla. Chapter of Assoc. Gen. Contractors of Am.,* 508 U.S. at 664, 113 S.Ct. at 2302; *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). First, the complaining party must have suffered an "injury in fact," *i.e.,* "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, *not conjectural or hypothetical.*" *Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136 (emphasis added) (internal citations and quotations omitted). Second, a causal relationship must exist between the complaining party's alleged injury and the challenged conduct. *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976). Finally, there must be a likelihood that a favorable decision will redress the injury, meaning that "the 'prospect of obtaining relief from the injury as a result of a favorable ruling' is not 'too speculative.'" *Northeastern Fla. Chapter of Assoc. Gen. Contractors of Am.,* 508 U.S. at 663–64, 113 S.Ct. at 2302 (quoting *Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984)). Because Kentec has failed to set forth any facts establishing an injury-in-fact, it lacks standing to claim that the prepayment provisions of KRS 350.0301(5)

and 405 KAR 7:092 § 6 violate its equal protection rights.

"In equal protection cases, persons are required to show that they have been in fact injured in order to have standing to challenge the validity of laws that apply to them." 16 Am.Jur.2d *Constitutional Law* § 142 (1998). In addressing various constitutional challenges to other statutes, Kentucky courts have long adhered to a strict injury-in-fact requirement. *E.g., Second St. Prop., Inc. v. Fiscal Court of Jefferson County,* 445 S.W.2d 709, 716 (Ky. 1969) ("Before one seeks to strike down a state statute he must show that the alleged unconstitutional feature injures him."); *Merrick v. Smith,* 347 S.W.2d 537, 538 (Ky.1961) ("It is an elementary principle that constitutionality of a law or its application is not open to challenge by a person or persons whose rights are not injured or jeopardized thereby."); *Steel v. Meek,* 312 Ky. 87, 226 S.W.2d 542, 543 (1950) (constitutional challenge to statute governing absentee voting procedures on grounds that it made no provisions for absentee voting by the blind, the illiterate, or the disabled, dismissed for lack of standing where appellant failed to show that he, himself, was prejudiced by the alleged discrimination); *Stein v. Ky. State Tax Comm'n,* 266 Ky. 469, 99 S.W.2d 443, 445–46 (1936) ("It is incumbent upon a party who assails a law invoked in the course thereof to show that the provisions of the statute thus assailed are applicable to him and that he is injuriously affected thereby.... We advert to the established principle in testing the validity of a statute, that objections thereto are not available to one not injured thereby.").

Kentec's allegations must be tested to ensure compliance with this injury-in-fact requirement. *Simon,* 426 U.S. at 39, 96 S.Ct. at 1925; *Ass'n of Data Processing Serv. Org., Inc. v. Camp,* 397 U.S. 150, 152,

90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). "It is the responsibility of the complainant *clearly* to allege *facts* demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Warth,* 422 U.S. at 518, 95 S.Ct. at 2215 (emphasis added). Moreover, it is improper to rely on Kentec's representations before this Court to establish standing. *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 547, 106 S.Ct. 1326, 1334, 89 L.Ed.2d 501 (1986) ("[T]he necessary factual predicate may not be gleaned from the briefs and arguments themselves."). Finally, the allegations of fact that would give rise to standing must affirmatively appear in the record and cannot be inferred from the averments in Kentec's pleadings. *FW/ PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 608, 107 L.Ed.2d 603 (1990) ("It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings, but rather must *affirmatively appear* in the record.") (emphasis added) (internal citations and quotations omitted).

To allege an injury-in-fact in the context of an equal protection challenge, the complaining party must set forth facts showing that it was *personally* denied equal treatment by the challenged conduct. *Hays,* 515 U.S. at 743–44, 115 S.Ct. at 2435; *Allen,* 468 U.S. at 755, 104 S.Ct. at 3326. Stated another way, a party cannot challenge the constitutionality of a statute "unless he can show that he is within the class whose constitutional rights are allegedly infringed." *Barrows v. Jackson,* 346 U.S. 249, 256, 73 S.Ct. 1031, 1035, 97 L.Ed. 1586 (1953). Kentec's equal protection argument is essentially that the prepayment requirement denies a formal administrative hearing on the amount of the proposed penalty assessment to those corporations that cannot afford to prepay the proposed assessment. Kentec was, therefore, re-

quired to allege specific facts showing that it, personally, was unable to prepay its proposed assessment. If it failed to make the necessary allegations, it has no standing. *FW/PBS, Inc.*, 493 U.S. at 231, 110 S.Ct. at 608.

The only averment in the entire record that even approaches the required showing was Kentec's statement in its unverified petition for formal administrative review that "Petitioner does not have sufficient funds by which to pay this large and excessive proposed assessment." At no point in this litigation has Kentec set forth any facts in support of this threadbare allegation. In the absence of such facts, Kentec's claim that it will be denied formal administrative review of its proposed assessment is, at best, "conjectural or hypothetical." *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136. *See also Warth*, 422 U.S. at 508, 95 S.Ct. at 2210 ("We hold only that a plaintiff ... must allege *specific, concrete facts* demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention. Absent the necessary allegations of a *demonstrable, particularized injury*, there can be no confidence of a real need to exercise the power of judicial review ....") (emphasis added) (internal citation and quotation omitted).

Nevertheless, even if Kentec's allegation were sufficient to confer standing under other circumstances, two additional problems exist.

[I]t is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed.

*Id.* at 501–02, 95 S.Ct. at 2206–07. While *Warth* dealt with a case originally brought in federal district court, its principles are applicable to matters subject to initial administrative adjudication. In this case, the Cabinet was acting as the "trial court." *See* KRS 350.0305 ("No objection to the final order shall be considered by the [reviewing] court unless it was raised before the cabinet or there were reasonable grounds for failure to do so. The findings of the cabinet as to the facts, if supported by substantial evidence, shall be conclusive."). In this capacity, the Cabinet has already exercised the power discussed in *Warth*, establishing requirements for pleading a claim of inability to prepay a proposed assessment. The requirements include, *inter alia*, "[a] statement of facts underlying the request," and "[a]n affidavit ... setting forth the applicant's income, property owned, outstanding obligations, the number and age of dependents, and a copy of his most recent Kentucky and federal income tax returns." 405 KAR 7:092 § 15(2). Kentec's pleading did not contain any of these elements. As Kentec failed to show an inability to prepay as required by the Cabinet's regulations, its equal protection claim should be dismissed under the analogous principles articulated in *Warth*.

Finally, Kentec's failure to plead facts demonstrating that it was personally denied equal treatment is exacerbated by its own admission. In the same petition for review, Kentec stated that "the terms and conditions of Section 15 of 405 KAR 7:092 for obtaining a waiver of the prepayment requirement are so strict and unreasonable as to preclude Petitioner's qualification for use thereof." This statement, which likely referred to the presumption against a waiver that arises under the circumstances set forth in 405 KAR 7:092 § 15(5)(b), is effectively an admission that Kentec would indeed have the assets to prepay the

amount of its proposed assessment. This admission contradicted Kentec's earlier averment and eviscerates its present claim that it is within the class of entities that are allegedly denied equal treatment by the prepayment requirement. *Cf. McNutt v. Gen. Motors Acceptance Corp.,* 298 U.S. 178, 190, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936) ("Here, the allegation in the bill of complaint as to jurisdictional amount was traversed by the answer. The court made no adequate finding upon that issue of fact, and the record contains no evidence to support the allegation of the bill. There was thus no showing that the District Court had jurisdiction and the bill should have been dismissed upon that ground.").

Despite Kentec's claim that it was unable to prepay, it has neglected to allege facts supporting this claim, failed to offer a scintilla of evidence to maintain it, and acted in a manner completely contrary to it. Kentec therefore has not shown that it was *personally* denied equal access to a formal hearing. It cannot now be heard to claim that the prepayment requirement injures other corporations that actually are unable to prepay. *Broadrick v. Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973) ("Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally *to others, in other situations* not before the Court."); *Barrows,* 346 U.S. at 255, 73 S.Ct. at 1034 ("Ordinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party."); *Martin v. Commonwealth,* 96 S.W.3d 38, 50 (Ky.2003) ("Generally, a person to whom a statute may constitutionally be applied cannot challenge it on the ground that it may conceivably be applied unconstitutionally to others in other situa-

tions not before the Court."). As Justice Holmes stated in *United States v. Wurzbach,* 280 U.S. 396, 50 S.Ct. 167, 74 L.Ed. 508 (1930), "if there is any difficulty . . . it will be time enough to consider it when raised by some one whom it concerns." *Id.* at 399, 50 S.Ct. at 169. Because Kentec has failed to show that it, personally, was injured, it has no standing to assert an equal protection challenge to the prepayment provisions.

### B. Procedural Due Process.

The majority opinion repeatedly refers to the formal administrative hearing on the amount of the proposed penalty assessment as a "due process hearing," *ante,* at 725–26, implying that the federal Due Process Clause and Section 2 of the Kentucky Constitution require this hearing to be held before payment of the proposed assessment. In dismissing the host of decisions holding to the contrary, the majority states that "[d]ecisions of the lower federal courts are not conclusive as to state courts." *Ante,* at 725. While this proposition is certainly correct with respect to matters of state law, *Bell v. Commonwealth,* 566 S.W.2d 785, 788 (Ky.App.1978), when this Court analyzes state legislation under the federal Due Process and Equal Protection Clauses, it is bound by the decisions of the United States Supreme Court. *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 461 n. 6, 101 S.Ct. 715, 722 n. 6, 66 L.Ed.2d 659 (1981) ("[W]hen a state court reviews state legislation challenged as violative of the Fourteenth Amendment, it is not free to impose greater restrictions as a matter of federal constitutional law than this Court has imposed."); *Oregon v. Hass,* 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975).

When a claim is made that the Due Process Clause requires a particular procedure, the governing principles are found

in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976):

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. at 903. Further, this Court has previously held that the *Mathews* test is applicable to procedural due process claims raised under Section 2 of the Kentucky Constitution. *Transp. Cabinet v. Cassity,* 912 S.W.2d 48, 51 (Ky.1995). Despite the binding precedents mandating application of the *Mathews* standard, the majority has concluded without analysis that due process requires a formal hearing on the amount of the proposed assessment to be held before a permittee can be required to pay this amount.

Before applying the *Mathews* test to Kentucky's regulatory scheme, it is worth discussing the fact that the federal scheme is substantially identical. In such circumstances, it is appropriate to examine how the federal courts have resolved similar issues. *E.g., Brooks v. Lexington–Fayette Urban County Hous. Auth.,* 132 S.W.3d 790, 801–02 (Ky.2004) (interpreting Kentucky Civil Rights Act); *Meyers v. Chapman Printing Co.,* 840 S.W.2d 814, 820–21 (Ky.1992) (same). This is especially true where our statute specifically states, as does KRS 350.028(5), that its purpose is to administer and enforce the regulatory programs established by federal law. *See Couch v. Natural Res. & Envtl. Prot. Cab-*

*inet,* 986 S.W.2d 158, 162 (Ky.1999) (adopting, for purposes of the Kentucky surface coal mining laws, the definition of "agent" used by the Sixth Circuit, because of "the relationship between the SMCRA and KRS Chapter 350" and "in the interest of consistency"). In fact, the SMCRA is a more stringent scheme with respect to prepayment of proposed penalty assessments than is the Kentucky scheme. Under the SMCRA, the permittee may request, without prepayment, an expedited public hearing on the fact-of-violation issue, 30 U.S.C. § 1275(a); 30 C.F.R. § 843.16; 43 C.F.R. § 4.1160 *et seq.;* but, by doing so, the permittee waives the further right to a more formal administrative review of that issue. 30 C.F.R. § 723.19(a). Like 405 KAR 7:092 § 3(4)(b), the federal scheme affords the permittee the right to request an assessment conference without prepayment. 30 C.F.R. §§ 723.18 & 845.18. However, if the permittee does not request the expedited hearing on the fact of violation, the permittee must prepay the proposed penalty assessment into escrow in order to obtain further review of either the fact of violation or the proposed penalty assessment. 30 U.S.C. § 1268(c); 30 C.F.R. § 723.19(a); 43 C.F.R. § 4.1152(b)(1). Despite the SMCRA's prepayment barrier to formal administrative review of *both* the fact of violation *and* the proposed penalty assessment, the federal courts have consistently held that the scheme is in accord with the Due Process Clause.

In *B & M Coal Corp. v. Office of Surface Mining Reclamation and Enforcement,* 699 F.2d 381 (7th Cir.1983), the United States Court of Appeals for the Seventh Circuit held that the Due Process Clause did not require a formal adjudicatory hearing on either issue prior to the escrow deposit of the penalty assessment. *Id.* at 386. In doing so, the court employed the *Mathews* analysis, and concluded that (1)

the effect of the prepayment on the private interest (the permittee's use of its money during the review process) was not of such a magnitude to render prepayment unconstitutional; (2) the opportunity for less formal hearings on the fact of violation and the amount of the assessment before prepayment sufficiently reduced the likelihood of an erroneous deprivation of the permittee's interest; and (3) a sufficient governmental interest validated the prepayment requirement, *i.e.*, promotion of effective collection of assessed civil penalties and promotion of the goals of the SMCRA. *Id.* at 385–86. *See also United States v. Finley*, 835 F.2d 134, 137 n. 4 (6th Cir.1987); *Graham v. Office of Surface Mining Reclamation and Enforcement*, 722 F.2d 1106, 1111–12 (3rd Cir.1983) ("We find, as has every other court which has considered the question, that the review procedures which were available ... *without* prepayment of the proposed penalty are more than sufficient to comply with due process requirements as set forth in [*Mathews* ].”); *Blackhawk Mining Co., Inc. v. Andrus*, 711 F.2d 753, 757–58 (6th Cir.1983); *John Walters Coal Co. v. Watt*, 553 F.Supp. 838, 840–41 (E.D.Ky.1982) ("While the Court is aware that under some circumstances, the enforcement of the prepayment requirement 'might' force some operators to choose between contesting a violation or staying in business, this private interest is simply not sufficient to offset the government's interest in collecting these prepayment penalties.") (internal citation omitted); *United States v. Crooksville Coal Co., Inc.*, 560 F.Supp. 141, 144 (S.D.Ohio 1982); *United States v. Hill*, 533 F.Supp. 810, 815 (E.D.Tenn.1982).

The *Mathews* analysis first requires consideration of the private interest affected by the official action. Where the private interest is not of overriding importance, something less than an evidentiary hearing prior to adverse administrative ac-

tion suffices. *Mackey v. Montrym*, 443 U.S. 1, 13, 99 S.Ct. 2612, 2618, 61 L.Ed.2d 321 (1979); *Dixon v. Love*, 431 U.S. 105, 113, 97 S.Ct. 1723, 1728, 52 L.Ed.2d 172 (1977); *Mathews*, 424 U.S. at 343, 96 S.Ct. at 907. In *Mathews*, the complaining party was a disabled worker deprived of his disability benefits, on which he depended for income, during the pendency of the administrative review process. 424 U.S. at 340, 96 S.Ct. at 905. Yet, the Court held that this private interest was not of sufficient overriding importance to mandate a pretermination hearing. *Id.* at 343, 96 S.Ct. at 907. The private interest implicated by the prepayment requirement of KRS 350.0301(5) and 405 KAR 7:092 § 6 is the use of the permittee's money, in the amount of the proposed penalty assessment, while the assessment review process is ongoing. In contrast to the situation presented in *Mathews*, the permittee retains its source of income. Moreover, if the permittee is successful in obtaining a reduction in the amount of the penalty assessment, the Cabinet is required to refund the appropriate amount of money within thirty days of receipt of the order reducing the assessment, plus interest. 405 KAR 7:092 § 13(6)(c). Interest is adequate compensation for the permittee's loss of use of its money during the review process. *Accord B & M Coal Corp.*, 699 F.2d at 385. Thus, the private interest affected is not substantial and certainly is not of sufficient overriding importance to *per se* require a formal hearing before payment of the assessment.

Second, *Mathews* mandates consideration of the risk of erroneous deprivation of the private interest. "[T]he Due Process Clause has never been construed to require that the procedures used to guard against an erroneous deprivation of a protectible 'property' or 'liberty' interest be so comprehensive as to preclude any possibili-

ty of error." *Mackey,* 443 U.S. at 13, 99 S.Ct. at 2618. In light of the procedural safeguards available to a permittee before it prepays the proposed penalty assessment, the risk of an erroneous deprivation of the private interest is minimal. Permittees are not only entitled to an informal conference on the proposed assessment amount, but also can obtain a formal administrative hearing on the fact of violation, without prepayment, unlike the federal scheme. The fact-of-violation procedure provides a formal evidentiary hearing that will necessarily include many of the same issues that are relevant to the amount of the penalty assessment, and thus reduces the risk of erroneous deprivation. In Kentec's particular case, the risk of erroneous deprivation is even less substantial. Kentec was unsuccessful in its fact-of-violation appeal, so logic dictates that it would inevitably be deprived, rightfully, of some amount of money. Moreover, seventy-five percent of the proposed penalty assessment ($22,500.00) was the minimum assessment authorized by law. With respect to this amount, further review of the penalty assessment would never yield a more favorable ruling for Kentec; thus, the possibility of erroneous deprivation of that sum was impossible once the fact of violation was affirmed. Kentec was subject to almost no risk of erroneous deprivation of its property; regardless, the preliminary administrative review procedures are sufficient to guard against that risk.

Finally, we must consider the government interest involved. According to the Cabinet, the prepayment requirement serves the government interest in the prompt collection of civil penalties. Undoubtedly, the prepayment requirement promotes this purpose by discouraging frivolous requests for hearings seeking only to delay the collection process. The government interest also "includes the administrative burden and other societal costs that would be associated with requiring, as a matter of constitutional right, an evidentiary hearing upon demand in all cases prior to the [collection of the penalty assessment]." *Mathews,* 424 U.S. at 347, 96 S.Ct. at 909. Thus, it is relevant that the costs of providing additional procedural safeguards to those permittees "whom the preliminary administrative process has identified as likely to be found undeserving," will eventually be spread to the taxpayers. *See id.* at 348, 96 S.Ct. at 909. As the government has articulated a sufficient interest to justify the prepayment requirement, and the private interest affected and the risk of erroneous deprivation are minimal, the prepayment barrier to a formal administrative hearing on the amount of a proposed penalty assessment is consistent with the due process provisions of the United States and Kentucky Constitutions.

### III. CONSTITUTIONALITY OF THE PREPAYMENT WAIVER PROVISIONS.

The majority has also held KRS 350.0301(5) and 405 KAR 7:092 § 15 to be unconstitutional insofar as they provide a waiver of the prepayment requirement for individuals who plead and demonstrate their inability to prepay, while making no such provision for corporations. There is no question that Kentec is a corporation and is thus within the class that was allegedly denied equal protection for purposes of this claim.[3] Even upon assuming the

---

3. The existence of an injury-in-fact remains dubious. As stated above, Kentec's petition for formal administrative review failed to meet the requirements for pleading an inability to prepay, set forth in 405 KAR 7:092 § 15.

Even an individual submitting such a request for a waiver would have faced summary dismissal as a result. As such, it defies logic for Kentec to claim that it was denied equal treatment solely because of its corporate status.

existence of Kentec's standing, however, its equal protection challenge must fail, because the classification between individuals and corporations is rationally related to a legitimate state interest.

The pecuniary private interest implicated by the classification is not a fundamental right, see Part II(B) of this opinion, *supra,* and statutory classifications between individuals and corporations have never been considered suspect. *See San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973) ("The system of alleged discrimination and the class it defines have *none* of the traditional indicia of suspectness: the class is not saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process."). Accordingly, the general rule applies: legislation regulating an economic matter enjoys a strong presumption of constitutionality and will be upheld if the classification drawn by the statute is rationally related to a legitimate state interest. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). *See also Holbrook v. Lexmark Int'l Group, Inc.,* 65 S.W.3d 908, 914 (Ky.2001); *Steven Lee Enter. v. Varney,* 36 S.W.3d 391, 394 (Ky.

2000); *Yeoman v. Commonwealth, Health Policy Bd.,* 983 S.W.2d 459, 470 (Ky.1998); *Wynn v. Ibold, Inc.,* 969 S.W.2d 695, 696 (Ky.1998); *Ky. Harlan Coal Co. v. Holmes,* 872 S.W.2d 446, 455 (Ky.1994). Under the guise of "rational basis" review, however, the majority has held the Cabinet to a much stricter standard than that required by the equal protection jurisprudence of both the United States Supreme Court and this Court.[4]

Statutory classifications based on non-suspect criteria "must be upheld against equal protection challenge if there is *any reasonably conceivable* state of facts that could provide a rational basis for the classification." *Fed. Communications Comm'n v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993) (emphasis added). *See also Heller v. Doe by Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993); *Walker v. Commonwealth,* 127 S.W.3d 596, 602 (Ky.2004); *Steven Lee Enter.,* 36 S.W.3d at 395; *Preston v. Johnson County Fiscal Court,* 27 S.W.3d 790, 795 (Ky.2000); *Weiand v. Bd. of Tr. of Ky. Ret. Sys.,* 25 S.W.3d 88, 93 (Ky.2000); *Commonwealth v. Howard,* 969 S.W.2d 700, 703 (Ky.1998). The possibility that a classification might result in some practical inequity does not cause it to fail the rational basis test. *Steven Lee Enter.,* 36 S.W.3d at 395 (If a rational basis is found

---

*Cf. Northeastern Fla. Chapter of Assoc. Gen. Contractors of Am.,* 508 U.S. at 666, 113 S.Ct. at 2303 ("To establish standing, therefore, a party challenging a set-aside program like Jacksonville's need only demonstrate *that it is able and ready* to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis.") (emphasis added). Nevertheless, because the question of standing is a closer one than that presented by Kentec's challenge to the prepayment requirement, I will assume its existence for purposes of Kentec's challenge to the waiver provisions.

4. Application of any standard of review other than rational basis would be patently improper, given the fact that the Court of Appeals based its decision upon the rational basis standard. *See Heller v. Doe by Doe,* 509 U.S. 312, 318–19, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993); *Fed. Communications Comm'n v. Beach Communications, Inc.,* 508 U.S. 307, 314 n. 6, 113 S.Ct. 2096, 2101 n. 6, 124 L.Ed.2d 211 (1993). Moreover, both parties have argued that the rational basis standard applies.

for the discrimination, the statute "must be upheld even if it is perceived to be unwise, unfair or illogical."); *Howard,* 969 S.W.2d at 703. *See also Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970); *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911).

The first step in the rational basis test is to examine the state interests served by the classification. *Wynn,* 969 S.W.2d at 696. Here, the Cabinet points out that KRS 350.0301(5) and 405 KAR 7:092 § 15 serve two state interests: (1) effective collection of penalties assessed under Kentucky's surface mining laws; and (2) ensuring that individuals are not deprived of the financial resources needed to meet basic living expenses. Despite the majority's out-of-hand dismissal of these purposes, it cannot seriously dispute that both of these articulated purposes are "legitimate state interests." A statutory classification can fail rational basis review only if it is completely irrelevant to the achievement of these legitimate state interests. *Heller,* 509 U.S. at 324, 113 S.Ct. at 2645; *Holt Civic Club v. City of Tuscaloosa,* 439 U.S. 60, 71, 99 S.Ct. 383, 390, 58 L.Ed.2d 292 (1978); *McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). *See also Chapman v. Gorman,* 839 S.W.2d 232, 239–40 (Ky.1992).

By allowing individuals to obtain prepayment waivers while denying corporations the same right, the classification promotes the effective collection of penalties. In *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973), the United States Supreme Court addressed an equal protection challenge to a state personal property tax that applied to corporations, but not individuals. Noting that the Illinois legislature had determined that the tax was almost impossible to administer consistently with regard to

individuals, but was "uniformly enforceable" with respect to corporations, the Court held that the discriminatory treatment did not violate the Equal Protection Clause. *Id.* at 365, 93 S.Ct. at 1006. It is important to note that the tax, itself, was unchanging: the tax that the state found difficult to apply to individuals was the same tax that it easily applied to corporations. Thus, the "rational basis" for this differential treatment inhered in the very nature of the corporate form. In other words, fundamental differences between corporations and individuals can give rise to rational bases for imposing differential burdens between the two. *See Quaker City Cab Co. v. Pennsylvania,* 277 U.S. 389, 406, 48 S.Ct. 553, 556, 72 L.Ed. 927 (1928) (Brandeis, J., dissenting) ("The difference between a business carried on in corporate form and the same business carried on by natural persons is, of course, a real and important one."), *abrogated by Lehnhausen,* 410 U.S. at 365, 93 S.Ct. at 1006.

For purposes of the effective collection of penalties, the relevant difference between individuals and corporations lies in the ability of a corporation to quickly undercapitalize itself. For example, the shareholders of a closely held corporation can easily transfer the corporation's assets to themselves, or to another corporate entity, thus divesting the corporation of its property while retaining ownership of such assets. Individuals have less ability to divest themselves of assets while retaining control thereof. If given the opportunity to seek prepayment waivers, corporations can undercapitalize in order to claim an "inability to prepay," and, ultimately, attempt to evade the penalty assessment. Therefore, as the differential treatment appears to be rationally related to the legitimate state interest in collecting penalties, the equal protection analysis should be at an end. *See Beach Communica-*

*tions*, 508 U.S. at 315, 113 S.Ct. at 2102 ("[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data."); *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 812, 96 S.Ct. 2488, 2499, 49 L.Ed.2d 220 (1976) ("The State is not compelled to verify logical assumptions with statistical evidence."); *Yeoman*, 983 S.W.2d at 470 ("The rational review standard is not hard for a legislature to meet. It merely requires one to postulate that the legislature could have envisioned that [the statute] would promote a legitimate state purpose—any legitimate state purpose.").

Even if the state interest in collecting penalties were not sufficient to justify the differential treatment, the distinction between individuals and corporations provides individuals with relief from the prepayment requirement insofar as they require a minimum amount of finances to meet basic human necessities. Kentec argues that corporate employees also require basic necessities. However, a classification's underinclusiveness with respect to its articulated purpose is insufficient to hold it unconstitutional under the rational basis test. "By itself, the fact that a legislative classification is underinclusive will not render it unconstitutionally arbitrary. The legislature is free to choose to remedy only part of a problem.... [I]t may 'select one phase of a field and apply a remedy there, neglecting the others.'" *Holbrook*, 65 S.W.3d at 915 (quoting *Cleland v. Nat'l College of Bus.*, 435 U.S. 213, 220, 98 S.Ct. 1024, 1028, 55 L.Ed.2d 225 (1978)). *See also Clover Leaf Creamery Co.*, 449 U.S. at 466, 101 S.Ct. at 725 ("[A] legislature need not strike at all evils at the same time or in the same way.") (internal citation and quotation omitted); *Dandridge*, 397 U.S. at 486–87, 90 S.Ct. at 1162 ("[T]he Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all. It is enough that the State's action be rationally based and free from invidious discrimination.") (internal citation omitted). There being no evidence of an invidious purpose here, I conclude that the General Assembly acted rationally in drawing this classification to ensure that indigent individuals are not deprived of their basic human necessities.

The party seeking to have a classification declared unconstitutional "is faced with the burden of demonstrating that there is *no conceivable basis* to justify the legislation." *Holbrook*, 65 S.W.3d at 915 (emphasis added). Kentec has failed to carry this burden. In fact, the classification between individuals and corporations is rationally related to two legitimate state purposes. This alone is sufficient to justify it under the Equal Protection Clause, and "the fact [that] the line might have been drawn differently at some point is a matter for legislative, rather than judicial, consideration." *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980).

Accordingly, I concur in the majority opinion's affirmance of the Secretary's order with respect to the fact of violation and dissent from the majority opinion's reversal of the Secretary's penalty assessment and its conclusion that the prepayment provisions of the statutory and regulatory schemes are unconstitutional.

JOHNSTONE, and ROACH, JJ., join this opinion.

Dissenting opinion by Justice ROACH.

I join Justice Cooper's excellent dissent. I write separately, however, to discuss my dismay at the majority's cavalier use of Section 2 of the Constitution of Kentucky.

While Section 2 certainly means something, its language cries out for a standard to guide its use and application. Unfortunately, the majority opinion fails to articulate any such standard. Quite simply, the majority's approach allows the courts of this Commonwealth to discard traditional standards for evaluating legislation and effectively allows the courts to sit as super-legislative bodies. This will allow the courts of the Commonwealth to use Section 2, as interpreted in the majority opinion, to reach any result that suits a particular judge's whims.

Almost fifteen years ago, in a pair of articles published in the *Northern Kentucky Law Review* and the *Kentucky Bench & Bar*, John David Dyche exhaustively traced the origins of Section 2 and its historic use by the courts of Kentucky. *See* John David Dyche, *Section 2 of the Kentucky Constitution—Where Did It Come From and What Does It Mean?*, 18 N. Ky. L.Rev. 503 (1991); John David Dyche, *The History and Meaning of Section 2 of the Kentucky Constitution*, Ky. Bench & Bar, Vol. 55, No. 4, at 17 (Fall 1991). He concluded the law review article by stating:

> If the court desires to continue employing section 2 as a substantive protection of property rights it must articulate the rationale and standards on which it does so. Arguments in support of a revival of substantive due process have been advanced by scholars on grounds including economic efficiency and institutional competency as well as history and political theory. The Kentucky Supreme Court should recognize and address these arguments. Unless it does so, the court itself will appear to be arbitrary in its interpretation of a constitutional pro-

vision which denies the existence of arbitrary power.

18 N. Ky. L.Rev. at 524.

This Court has once again failed to adopt such standards. I too find it quite ironic that this Court is more than willing to apply Section 2 to the legislative branch, yet remains unwilling to consider the possibility that its haphazard use of that section is itself tantamount to an exercise of absolute and arbitrary power.

COOPER and JOHNSTONE, JJ., join this dissenting opinion.