RENDERED: MARCH 1, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-1471-MR

BAPTIST HEALTHCARE SYSTEM, INC.
D/B/A BAPTIST HEALTH PADUCAH                                    APPELLANT


                          APPEAL FROM FRANKLIN CIRCUIT COURT
v.                        HONORABLE THOMAS D. WINGATE, JUDGE
                          ACTION NO. 21-CI-00613



MERCY HEALTH – LOURDES HOSPITAL, LLC
D/B/A MERCY HEALTH – LOURDES HOSPITAL,
AND COMMONWEALTH OF KENTUCKY,
CABINET FOR HEALTH AND FAMILY SERVICES,
OFFICE OF INSPECTOR GENERAL, DIVISION
OF CERTIFICATE OF NEED                                          APPELLEES



OPINION
AFFIRMING

** ** ** ** **

BEFORE: EASTON, ECKERLE, AND JONES, JUDGES.

ECKERLE, JUDGE: An administrative agency denied a health care provider its

application for an additional cancer treatment facility in Paducah. The Franklin

Circuit Court reviewed the agency's decision, found multiple errors, and directed the application be approved. The administrative agency did not appeal, but an affected party did. We have reviewed the Circuit Court's order and, for the reasons announced below, agree the agency erred and should have approved the application.

## BACKGROUND

Appellee, Mercy Health-Lourdes Hospital, L.L.C. ("Lourdes"), applied to Appellee, the Commonwealth of Kentucky, Cabinet for Health and Family Services, Office of Inspector General, Division of Certificate of Need ("Cabinet"), for a Certificate of Need ("CON") to establish a megavoltage radiation therapy ("MVRT") service at its acute care hospital in Paducah, Kentucky. Appellant, Baptist Healthcare System, Inc. d/b/a Baptist Health Paducah ("Baptist"), entered an appearance as an "affected person" and opposed the application because it operates a similar MVRT nearly three miles away from Lourdes's proposed site.

A Hearing Officer for the Cabinet conducted a 10-day public hearing via Zoom. The Hearing Officer subsequently issued Findings of Fact, Conclusions of Law, and a Final Order ("Final Order") denying Lourdes a CON. The Hearing Officer specifically found the application inconsistent with Review Criteria 1 (the State Health Plan), 2 (Need and Accessibility), and 4 (Costs, Economic Feasibility,

and Resource Availability) of the CON regulations.[1] In summary, the Hearing Officer concluded that: (1) Lourdes's application did not demonstrate that it would meet the threshold, 6,000-procedure minimum by the second year of operation; (2) Lourdes's application did not demonstrate a sufficient need, as Baptist's facility was meeting the current and anticipated needs of the geographic area; and (3) Lourdes's application did not demonstrate that the more than ten-million-dollar expenditure was an economical use of funds given that the status quo was meeting the current needs in the geographic area.

The Hearing Officer also denied Lourdes's motion for reconsideration, which resulted in Lourdes's filing of a Complaint in Franklin Circuit Court seeking review of the Cabinet's decision. The Complaint raised multiple counts, and the Circuit Court dismissed two of the counts before the parties ultimately briefed and orally argued the remaining issues.

The Circuit Court then entered an Order ("Order") finding and holding that the megavoltage radiation standards adopted in the State Health Plan violated Section 2 of the Kentucky Constitution. Specifically, the Circuit Court determined that the regulatory requirement than an applicant demonstrate that 6,000-megavoltage radiation procedures will be performed in the second year of

---

[1] The CON statutory and regulatory scheme is discussed in greater detail *infra*.

the program's operation does not pass constitutional muster as it is an arbitrary number unsupported by any rational basis.

Additionally, the Circuit Court held that the threshold is contrary to the purposes of KRS[2] 216B.010, the enabling statute for the regulation. The goal of the CON program, the Circuit Court noted, "is 'to improve the quality and increase access to health-care facilities, services, and providers, and to create a cost-efficient health-care delivery system for the citizens of the Commonwealth.'" Order at 11 (citing KRS 216B.010). The rational bases proffered by the Cabinet and Baptist were: "the 'Blue Book,' general discretion awarded to the Cabinet, and the fifteen (15) programs that have met this requirement." Order at 11. In contrast, the Circuit Court noted, between 2014 and 2019, more than half of the programs throughout the state did not provide 6,000 procedures. The Circuit Court noted that those programs are largely located in rural areas and are "providing vital services and medical options for cancer patients in Kentucky." *Id*. "Given this data, the Court must question why the Cabinet has not reevaluated the 6000[-] procedure threshold." *Id*.

The Circuit Court held that there was no support for finding that the 6,000-procedure threshold promoted the goal of the CON program. Additionally,

---

[2] Kentucky Revised Statutes.

-4-

the Circuit Court found that Lourdes's program "is necessary, is more accessible to rural patients, and is cost-effective." Order at 12.

Based on its conclusion that the 6,000-procedure threshold violates Section 2 of the Kentucky Constitution and is now void, the Circuit Court further found that the Cabinet's findings relating to Criterion 1 were arbitrary and not supported by substantial evidence. The Circuit Court further found that two other findings in the Final Order were arbitrary and not supported by substantial evidence.

Regarding Criterion 2 (Need and Accessibility), the Circuit Court held that the findings were arbitrary and not supported by substantial evidence because the number of radiation oncologists in the area were fewer than what is recommended. The Hearing Officer had found that Drs. Peter Locken and Salvador Espinoza, the radiation oncologists who serviced Baptist's facility in the area, were equivalent to 1.85 full-time equivalent ("FTE") radiation oncologists. However, this number appeared inflated, as Dr. Espinoza only worked 12 or 13 weeks per year at the Baptist facility, and sometimes he worked there while Dr. Locken was absent. "[T]he record demonstrates that they are the equivalent of one (1) full time employee. The Hearing Officer committed plain error in reaching this conclusion as it is wholly unsupported by the record." Opinion at 17. Additionally, the Circuit Court held that the Hearing Officer erred by concluding a

single full-time physician can meet the demand in the service area.  Notably, the Hearing Officer found that the American College of Radiology and American Society for Radiation Oncology recommended one radiation oncologist per 200-300 new patients per year.  Baptist, however, had 615 new patients in 2019.  Additionally, Baptist performed 12,123 radiation oncology procedures in 2019, with the cancer incident rate in the region expected to grow by 7.5% over the next five years.  Thus, the Circuit Court found the Hearing Officer's conclusions regarding Criterion 2 were arbitrary and not supported by substantial evidence because the "Hearing Officer plainly disregarded the evidence in the record that there is a need for radiation oncology services in the area."  Order at 18.

Finally, the Circuit Court held that the Hearing Officer's findings relating to Criterion 4 (Costs, Economic Feasibility, and Resource Availability) were erroneous.  Fundamentally, the error identified by the Circuit Court was simple:  because the status quo is not currently meeting the area's needs nor the anticipated growth in needs, it was error for the Hearing Officer to find that the existing program was more cost effective than the proposed program.  Secondarily, the Circuit Court also held that the Hearing Officer lacked substantial evidence to find that the existing program was more cost effective when the data showed that Lourdes's anticipated charges were 8.84 times that of Medicare, while Baptist's charges are 17.4 times that of Medicare.

Accordingly, the Circuit Court reversed the Cabinet's denial of a CON and ordered a CON be approved for Lourdes.

Baptist appealed to this Court. The Cabinet did not file a brief. Lourdes filed a brief defending the Order and raising additional claims to support reversing the Final Order. We are affirming the Circuit Court's Order for the reasons announced below and do not address any of the additional claims.

**ANALYSIS**

"When reviewing the circuit court's ruling on an agency's decision, an appellate court stands in the shoes of the circuit court and reviews the agency's decision for arbitrariness." *Nurses' Registry and Home Health Corp. v. Gentiva Certified Healthcare Corp.*, 326 S.W.3d 15, 17 (Ky. App. 2010) (citing *Martin County Home Health Care v. Cabinet for Health and Family Serv's*, 214 S.W.3d 324, 326 (Ky. App. 2007)). We review issues of statutory interpretation and other issues of law *de novo*. *Id*.

I.    **Does the 6,000-procedure threshold constitute an arbitrary exercise of power?**

The first issue to be addressed is a constitutional claim, which we review *de novo*. The Circuit Court held that the 6,000-procedure threshold violated Section 2 of the Kentucky Constitution, which prohibits the government

from exercising absolute and arbitrary power. *See, e.g.*, *Kentucky Milk Marketing and Antimonopoly Comm'n v. Kroger Co.*, 691 S.W.2d 893, 899 (Ky. 1985).

## A. Section 2 standard of review

Both parties proffer that our review of the constitutionality of the 6,000-procedure threshold is to determine whether there was a rational basis. However, it has been opined that the Section 2 "standard may be more toothsome than rational-basis review." *Tiwari v. Friedlander*, 26 F.4th 355, 370 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 444 (2022). Indeed, the Kentucky Supreme Court has described Section 2 with stronger verbiage than one would expect from rational-basis review:

> Section 2 is a curb on the legislature as well as on any other public body or public officer in the assertion or attempted exercise of political power. *Sanitation Dist. No. 1 v. City of Louisville*, 308 Ky. 368, 213 S.W.2d 995 (1948). Whatever is contrary to democratic ideals, customs and maxims is arbitrary. Likewise, whatever is essentially unjust and unequal or exceeds the reasonable and legitimate interests of the people is arbitrary, *id.* No board or officer vested with governmental authority may exercise it arbitrarily. If the action taken rests upon reasons so unsubstantial or the consequences are so unjust as to work a hardship, judicial power may be interposed to protect the rights of persons adversely affected. *Wells v. Board of Education of Mercer County*, Ky., 289 S.W.2d 492, 494 (1956). Our function is to decide a test of regularity and legality of a board's action by statutory law and by the constitutional protection against the exercise of arbitrary official power. *Id.*

Section 2 is broad enough to embrace the traditional concepts of both due process of law and equal protection of the law. *Pritchett v. Marshall*, Ky., 375 S.W.2d 253, 258 (1963). Unequal enforcement of the law, if it rises to the level of conscious violation of the principle of uniformity, is prohibited by this Section. *City of Ashland v. Heck's Inc.*, Ky. 407 S.W.2d 421 (1966); *Standard Oil v. Boone County Bd. Of Sup'rs*, Ky., 562 S.W.2d 83 (1978). The question of reasonableness is one of degree and must be based on the facts of a particular case. *Boyle Cty. Stockyards Co. v. Commonwealth, etc.*, Ky. App., 570 S.W.2d 650 (1978).

*Kentucky Milk*, 691 S.W.2d at 899. The Kentucky Supreme Court applied these Section 2 standards some 20 years later and held unconstitutional a statute and a regulation that allowed an agency to assess a penalty without access to a formal hearing unless the one penalized could prepay the fine. *Commonwealth Natural Resources and Environmental Protection Cabinet v. Kentec Coal Co., Inc.*, 177 S.W.3d 718 (Ky. 2005). The case is significant because the dissent in that case noted "dismay at the majority's cavalier use of Section 2 of the Constitution[.]" *Id.* at 740 (Roach, J., dissenting). The dissent labeled the majority opinion as lacking a "standard to guide" the use and application of Section 2 analyses. *Id.* at 741.

Since *Kentec*, our Supreme Court provided additional clarity to the Section 2 analysis when the allegations concern arbitrary, administrative actions affecting economic or property rights, which are the rights at issue in the instant case. Section 2 is satisfied when three requirements are met. First, the alleged deprivation of rights must have "a rational basis in furtherance of a legitimate

-9-

government interest[.]" *City of Villa Hills v. Kentucky Retirement Systems*, 628 S.W.3d 94, 109 (Ky. 2021). Second, the affected party must have been "afforded adequate procedural due process[.]" *Id.* Finally, the decision must have been "informed by substantial evidence of record." *Id.* Accordingly, our initial review of the 6,000-procedure threshold is to determine whether there exists a rational basis in furtherance of a legitimate government interest. We review the Circuit Court's determination of this constitutional question *de novo*. *See, e.g.*, *Commonwealth v. DLX, Inc.*, 42 S.W.3d 624 (Ky. 2001).

**B.  Is the 6,000-procedure threshold rationally related to a legitimate government interest?**

Without a doubt, the Commonwealth has a legitimate governmental interest in ensuring that "citizens of this Commonwealth will have safe, adequate, and efficient medical care" with no "proliferation of unnecessary health-care facilities, health services, and major medical equipment [that] results in costly duplication and underuse of such facilities, services, and equipment" and "increases the cost of quality health care within the Commonwealth." KRS 216B.010. These are the stated legislative findings and purposes underlying the CON program, and neither party disputes that they are legitimate interests.

Our question, then, is whether the 6,000-procedure threshold is rationally related to those legitimate interests. To perform this rational-basis

analysis, we look for a "rational relationship to a legitimate state end." *Kentec Coal*, 177 S.W.3d at 725. There must be some "'reasonable basis'" or "'substantial and justifiable reason'" for the created classification. *Vision Mining, Inc. v. Gardner*, 364 S.W.3d 455, 466 (Ky. 2011) (quoting *Cain v. Lodestar Energy, Inc.*, 302 S.W.3d 39, 42 (Ky. 2009)). And though this standard "favors the government, it would be incorrect to state that courts always hold that legislatively-created classifications are rationally related to a legitimate state interest." *Id*. Rational-basis review is a high bar:

> A statute is presumed constitutional, . . . and "[t]he burden is on the one attacking the legislative arrangement *to negative every conceivable basis which might support it*," . . . whether or not the basis has a foundation in the record. Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it "'is not made with mathematical nicety or because in practice it results in some inequality.'" . . . "The problems of government are practical ones and may justify, if they do not require, rough accommodations – illogical, it may be, and unscientific."

*Steven Lee Enterprises v. Varney*, 36 S.W.3d 391, 395 (Ky. 2000) (quoting *Heller v. Doe by Doe*, 509 U.S. 312, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993) (citations omitted) (alterations and emphasis added in original)) (discussing rational-basis review of equal protection claim).

-11-

The regulation at issue here requires a CON applicant to demonstrate the proposed MVRT program will, at minimum, perform 6,000 annual procedures by the end of the second year of operation. 900 KAR[3] 5:020, Section IV.B.1. The Cabinet filed no brief in the instant appeal, but below it proffered as its rational basis that 15 of the current MVRT programs met the threshold in 2019, and the threshold was lower than a few other states' thresholds.[4]

The Circuit Court rejected the finding that a rational basis existed between the stated rationale and the legitimate state end. Principally, it found no

---

[3] Kentucky Administrative Regulations.

[4] We additionally note that at oral argument the parties argued about whether the Cabinet had evidence or data to support the threshold. Lourdes believed none existed, noting that it had made an open records request to the Cabinet during the proceedings below, specifically requesting:

> Information considered by the Cabinet regarding the metric, simulation, projection, data, or data compilation that supports the requirement that 6000 Megavoltage Radiation Oncology Procedures are reasonable and necessary to maintain a financially viable Megavoltage Radiation Oncology Program from 2011 through present.

The Cabinet's written response to this open records request stated that it "does not collect this data." At oral argument, this Court requested the Cabinet to explain its open records request response. The attorney for the Cabinet stated that it had not seen the open records request because its Office of the Inspector General handles those requests. Additionally, the Cabinet noted that Lourdes did not take any additional steps regarding the response, such as asking the Attorney General to review the response. While not an issue before us, we note that per KRS 61.880(2)(a), the Attorney General can be notified to review a "denial of a request to inspect a public record[.]" Here there was no denial; the Cabinet affirmatively stated it "does not collect this data." Moreover, discovery on this issue was unlikely, as the constitutional claim could not be decided by the hearing officer, and the claim was first before the Trial Court on a declaration of rights action, which is by nature a summary action. *See* KRS Chapter 418. Thus, we accept as true the record evidence showing the Cabinet "does not collect this data."

-12-

rational relation existed because most programs did not meet this threshold. Between 2014 and 2019, 18 of the 34 programs that conducted MVRT performed fewer than 6,000 procedures. One even provided fewer than 2,000 procedures. We agree with the Circuit Court that establishing the threshold at 6,000 procedures when existing usage rates run the gamut constitutes a shot-in-the-dark, arbitrary classification that is not rationally related to legitimate interests. All of the programs in operation are providing critical cancer care, not "unnecessary" health services, KRS 216B.010, and yet over half do not meet the threshold set by the Cabinet. In this circumstance, creating a standard that over half of the MVRT programs cannot meet is not rationally related to the legitimate governmental interests announced in KRS 216B.010.

The Circuit Court also found it significant that many of the sub-6,000-procedure programs are located in rural areas of Kentucky, and the proposed program would also be located in a rural area of Kentucky. We agree. Equally significant, though, is the fact that some of the programs not meeting the threshold were located in Louisville, the most populous city in the Commonwealth. This evidence demonstrates that there is no rational relation between a 6,000-procedure threshold and the population needs throughout the Commonwealth. Thus, establishing a threshold at 6,000-procedures is wholly arbitrary and not rationally

related to actual, operational levels of the then-functioning, cancer treatment centers throughout the <u>entire</u> Commonwealth.

Additionally, other states' utilization of similar or more stringent thresholds proves arbitrariness, not rationality. First, there is no uniform agreement; each state has a different threshold. Indeed, to establish rational restrictions, each state must consider its own particularized geographic and population concerns. Or, to irrationally establish restrictions, each state would choose a random number. *Cf. Vision Mining*, 364 S.W.3d at 473 (footnote omitted) ("Simply put, one type of disparate treatment does not constitute a rational basis or substantial and justifiable reason for another form of disparate treatment."). Either way, the lack of a uniform agreement among states supports an arbitrariness finding.

Second, the bare fact that other states have thresholds only proves that other states have thresholds. That fact neither proves that each of those states has a legitimate interest, nor that the thresholds are rationally related to those interests. Quite possibly those thresholds are also arbitrarily chosen. Alternatively, those thresholds may have a rational basis but be based on significantly different criteria. The establishment of a threshold is not inherently arbitrary, but there must be clear criteria for the threshold, and those criteria must have a rational relationship to a legitimate state interest. Simply picking a number is arbitrary. But so is picking a

-14-

number based on criteria that lack sound factual bases. At minimum, the existence of other thresholds does not establish that the threshold chosen here is rationally related to the legitimate, governmental interest. Having negated the bases for the regulation, Lourdes has proven a Section 2 violation. *See Varney*, 36 S.W.3d at 395.

Baptist counters that the 6,000-procedure threshold advances multiple, legitimate, governmental interests, any one of which provides a rational basis for the regulation.[5] First, because the equipment for one program can provide at least 9,500 procedures annually, the threshold ensures that any singular program will not be underutilized. We find this argument unavailing. The existing programs show that much lower thresholds are viable and provide needed healthcare. The 6,000-procedure threshold here amounts to nothing more than a guess about the economies of scale, and an unsupported guess at that, which demonstrates arbitrary action by the Cabinet.

Second, Baptist proffers that the threshold might serve an ancillary purpose of condensing patient volumes that lead to downstream benefits of scale, expertise, and specialization. While it is possible that limiting the number of

---

[5] Again, the Cabinet, which promulgated the regulation, did not file a brief and, thus, it does not raise these additional reasons. We nonetheless address them as they do not pass rational basis review.

providers could result in an increase in patients for each provider,[6] that bare supply/demand logic could support any economic regulation and wholly nullify judicial scrutiny under rational basis review. We will not carve out an exception that renders rational basis meaningless. And the current utilization pattern does not even provide a reasonable, factual basis for a conclusion that limiting the supply to greater-than-6,000-procedure programs is rationally related to ensuring the programs are profitable and capable of operating. Most of the programs are well below this threshold and continue to operate.

Third, Baptist proffers that the Cabinet's engaging in the process of drawing a line to advance the goals of the CON program is evidence that the line it drew is rationally related to the legitimate state interests. As with its second argument, Baptist's argument creates a feedback loop that nullifies the test. Drawn lines can be arbitrary and irrational. Notably, by not filing a brief on appeal the Cabinet ostensibly abandoned support for the line it drew.

Fourth, Baptist argued at oral arguments before this Court, and also in the briefs in the Circuit Court below, that the 6,000-procedure threshold is rationally related to the "Blue Book" guidelines for equipment utilization. The text is hardly current, as it was last published in 1991, and its conclusions are

---

[6] That "logic" begs the question: will patients undergoing challenging cancer treatments endure additional burdens imposed by artificial scarcity creation? Or will cancer-ridden patients fatigue out of the demand chain?

questionable at best given the copious evidence the parties presented below regarding changing usage rates and changing populations. Furthermore, the Blue Book guidelines at best demonstrate that there is no one-size-fits-all approach to how many procedures a program should perform in a year, as the guidelines demonstrate scenarios in which sub-6,000-procedure levels would be considered realistic annual loads. In sum, if the Cabinet had based its 6,000-procedure threshold on the Blue Book guidelines, the text both on its face and in modern application does not provide rational basis support.

Additionally, though both parties cite us to numerous cases to support their arguments, "No case can be completely dispositive of another when conducting a rational basis analysis unless it involves the same statute, same facts and same arguments for what 'rational basis' exists to uphold the statute." *Teco/Perry County Coal v. Feltner*, 582 S.W.3d 42, 46 n. 2 (Ky. 2019). This maxim is especially true of *Christ Hospital Corporation, Inc. v. Saint Elizabeth Medical Center, Inc.*, No. 2018-CA-001096-MR, 2019 WL 3990994 (Ky. App. Jun. 13, 2019), a not-to-be-published opinion of this Court cited by both parties. This case offers no "binding precedent," RAP[7] 40(D)(1). It largely centered on a violation of Section 59 of the Kentucky Constitution (impermissible special

---

[7] Kentucky Rules of Appellate Procedure.

legislation).  And it had nothing to do with the 6,000-procedure threshold for MVRT volumes.

Finally, we respectfully disagree with our esteemed colleague in her well-written dissent that we have "placed the burden of proving a rational basis squarely on the shoulders of Baptist and the Cabinet."  Slip Op. at 39.  Though the burden is great on one attacking the constitutionality of a regulation, Lourdes has met that burden by providing arguments and evidence "to negative every conceivable basis which might support" the rational basis for the regulation. *Varney,* 36 S.W.3d at 395.  Most notably, as it relates to the dissent's concerns regarding increased cost of quality health care in Kentucky, KRS 216B.010, and "overinvestment in and maldistribution of health care facilities in the Commonwealth[,]" Slip Op. at 42, Lourdes demonstrated that at whatever capacity it would operate by year two, it anticipated the fees to cancer patients would be considerably lower than those charged to Baptist patients.  Because Lourdes has met its burden of proving that the 6,000-procedure threshold for MVRT volumes is not rationally related to a legitimate, state interest, we affirm the Circuit Court's Order inasmuch as it found a Section 2 violation.

## C.  Is the 6,000-procedure threshold consistent with KRS 216B.010?

As a related issue, Baptist further argues that the Circuit Court erred by finding the 6,000-procedure threshold was invalid under KRS 216B.010 because it does not promote the goals of the CON program.  But the same reasoning that makes the threshold arbitrary under Section 2 holds true to the statutory claim.  The threshold is an arbitrarily-drawn line that is not consistent with the purposes of KRS 216B.010.

Baptist also argues that Lourdes's MVRT "proposal is the epitome of unnecessary costly duplication."  Appellant's Brief at 16.  Baptist notes that there is no evidence that any patient in the Paducah area, an area that includes a higher MVRT use rate than other areas of the Commonwealth, has been unable to access MVRT on a timely basis.

This argument goes to Review Criteria 2 and 4, not to the instant constitutional and statutory argument.  In sum, we affirm the Circuit Court's Order inasmuch as it found the 6,000-procedure threshold as violative of Section 2 of the Kentucky Constitution and not consistent with KRS 216B.010.

**II.    Was the Final Order arbitrary and not supported by substantial evidence?**

Our analysis does not end with the constitutional claim, though, as that holding only applies to the Final Order's analysis of Review Criterion 1 – Consistency with the State Health Plan.  The Final Order also found Lourdes's application failed to satisfy Review Criteria 2 and 4.  The Circuit Court's review of the Final Order determined that the Hearing Officer erred in her findings and conclusions on all three of these Review Criteria.  Baptist argues the Circuit Court erred when reversing the Hearing Officer's Final Order on these issues.  Our standard of review of the Final Order's factual findings and conclusions is different than our *de novo* review of the constitutional claim.  Following a recitation of the applicable standard of review, we analyze the Final Order's findings and holdings of the three Review Criteria *seriatim*.

**A.  Standard of Review**

The Cabinet reviewed the CON application pursuant to:  KRS 216B.040(2)(a)2.a.-e.; the formal review criteria in 900 KAR 6:070; and the State Health Plan (in place at the time of the application), 900 KAR 5:020.  Judicial review of a decision of an administrative agency is ultimately a review for arbitrariness.  *American Beauty Homes Corp. v. Louisville and Jefferson County Planning and Zoning Commission*, 379 S.W.2d 450, 456-57 (Ky. 1964).

Arbitrariness may be found in three circumstances: "(1) action in excess of granted powers, (2) lack of procedural due process, and (3) lack of substantial evidentiary support[.]" *Id.* at 456.

The third circumstance is implicated here, and our review is for substantial evidence. *See, e.g.*, *Starks v. Kentucky Health Facilities*, 684 S.W.2d 5, 6-7 (Ky. App. 1984) (citing KRS 216B.120(2) (since repealed)) (holding the proper standard of a CON decision is "whether the findings of fact in issue are supported by substantial evidence and are not clearly erroneous based upon a review of the record as a whole"). Substantial evidence "is defined as evidence of substance and consequence when taken alone or in light of all the evidence that is sufficient to induce conviction in the minds of reasonable people." *McManus v. Kentucky Retirement Systems*, 124 S.W.3d 454, 458 (Ky. App. 2003) (citing *Bourbon County Bd. of Adjustment v. Currans*, 873 S.W.2d 836, 838 (Ky. App. 1994); *Transportation Cabinet v. Poe*, 69 S.W.3d 60, 62 (Ky. 2001); and *Special Fund v. Francis*, 708 S.W.2d 641, 643 (Ky. 1986)). Under this standard, the reviewing court does not review the evidence *de novo*, but, instead, the "reviewing court must hold fast to the guiding principle that the trier of facts is afforded great latitude in its evaluation of the evidence heard and the credibility of witnesses appearing before it." *Bowling v. Natural Resources and Environmental Protection*

*Cabinet*, 891 S.W.2d 406, 409-10 (Ky. App. 1994) (citing *Kentucky State Racing Commission v. Fuller*, 481 S.W.2d 298, 308 (Ky. 1972)).

Furthermore, pursuant to *McManus*, *supra*, when the administrative body finds the party with the burden of persuasion has failed to meet that burden, "the issue on appeal is whether the evidence in that party's favor is so compelling that no reasonable person could have failed to be persuaded by it." 124 S.W.3d at 458 (citations omitted). The dissent disagrees with our application of substantial evidence to the *McManus* standard. *See* Slip Op. at 31 ("While substantial evidence plays a role in a **second-level** *McManus* review, the review is more nuanced than simply searching for substantial evidence or the lack thereof.") (emphasis added).

Respectfully, we believe substantial evidence review is the first step even under *McManus*. As noted by our Supreme Court, a "two-step approach by **first** considering whether the . . . final order [is] properly supported by substantial evidence" is "appropriate because it hews to the language of KRS 13B.150, which identifies seven potential grounds for reversal including that the . . . order is '[w]ithout support of substantial evidence on the whole record.'" *Kentucky Retirement Systems v. Ashcraft*, 559 S.W.3d 812, 819 (Ky. 2018) (emphasis added). *See also Bradley v. Kentucky Retirement Systems*, 567 S.W.3d 114, 119 (Ky. 2018) (emphasis added) ("As explained more fully in *Ashcraft*, even where

-22-

the applicant loses before the Board, **it is appropriate on judicial review for the courts, at every level, to first consider whether the denial is supported by substantial evidence**. If it is not so supported, the court is required to reverse . . . .”). Where the record contains substantial evidence for both sides, *i.e.*, the evidence is in “equipoise,” the *McManus* “compelling evidence” standard “properly breaks the tie.” *Bradley*, 567 S.W.3d at 120. As we analyze *infra*, no such tie existed as substantial evidence did not support the Hearing Officer’s findings. Notably, neither side cited to nor argued *McManus* in their briefs; they both focused on substantial evidence. As there was not substantial evidence supporting both sides in the instant case, we may, and do, conclude under *McManus* that Lourdes’s evidence was so compelling that no reasonable person could have failed to be persuaded by it.

### B. Review Criterion 1 – the State Health Plan

As we held above, the 6,000-procedure threshold requirement of the State Health Plan is unconstitutional and void. The Final Order found and concluded that Lourdes’s application was not consistent with Review Criterion 1 solely because it did not meet this 6,000-procedure threshold. As this threshold is now void, the Hearing Officer’s conclusion that Lourdes’s application did not comport with the State Health Plan under Review Criterion 1 is arbitrary and not supported by substantial evidence.

**C. Review Criterion 2 – Need and Accessibility**

The Hearing Officer concluded that Lourdes's application was not consistent with Criterion 2 – Need and Accessibility, which requires that:

> The proposal shall meet an identified need in a defined geographic area and be accessible to all residents in the area. A defined geographic area shall be defined as the area the proposal seeks to serve, including its demographics, and shall not be limited to geographical boundaries[.]

KRS 215B.040(2)(a)2.b.

The Circuit Court held the Hearing Officer's findings were not supported by substantial evidence and led to an arbitrary conclusion:

> First, the Hearing Officer plainly erred by finding that Dr. Locken and Dr. Espinoza combined are equivalent to 1.85 full time employees. Presently, Dr. Locken is the only radiation oncologist in the service area. Dr. Espinoza is based in Michigan and provides *locum tenes* coverage for Dr. Locken thirteen (13) weeks per year. Further, when Dr. Espinoza is present, Dr. Locken is not. Thus, the Court agrees with Mercy that the record does not support that Dr. Locken and Dr. Espinoza combined are equivalent to 1.85 full time employees. In fact, combined, the record demonstrates that they are the equivalent of one (1) full time employee. The Hearing Officer committed plain error in reaching this conclusion as it is wholly unsupported by the record.
>
> Second, the Court agrees with [Lourdes] that the Hearing Officer erred by concluding that a single full-time physician can meet the demand in the service area. The Hearing Officer found that the American College of Radiology and American Society for Radiation Oncology recommended a radiation oncologist to see between 200

-24-

and 300 new patients per year. The record demonstrates that Baptist saw 615 new patients in 2019. It is inconceivable how the Hearing Officer concluded that single full-time physician can meet the demand in the service area based on the number of new patients per year when compared to the recommended number of new patients that a single radiation oncologist should see per year. The Hearing Officer also found that Baptist performed 12,123 radiation oncology procedures in 2019 and that the cancer incidence rate in the region is expected to grow by 7.5% over the next five (5) years.

The Hearing Officer plainly disregarded the evidence in the record that there is a need for radiation oncology services in the service area. Professional standards clearly support that the service area's needs are not being met. Accordingly, Hearing Officer's conclusion regarding Criterion 2 (Need and Accessibility) is plainly arbitrary because it is not supported by substantial evidence.

Order, pp. 17-18 (footnote omitted).

We do not agree with the Circuit Court's reasoning, but we do agree with its conclusion. The Hearing Officer's arbitrary action occurred in her conclusions of law, not in her factual findings.

As the Hearing Officer correctly found in her findings of fact, substantial evidence in the form of multiple, professional standards and testifying experts showed that radiation oncologists are recommended to see *at most* 200 to 300 new patients a year. Final Order, pp. 31-32. Substantial evidence also showed that Baptist had over 600 new patients per year. Final Order, p. 31. That evidence alone would require a conclusion that more than 2.0 FTE radiation oncologists are

-25-

necessary to service the area. Yet, the Hearing Officer concluded that Drs. Locken and Espinoza are sufficient to meet the demand despite combining to, at best, 1.85 FTE radiation oncologists. Final Order, pp. 31, 46-47. Even though there was testimony that Dr. Locken worked substantial hours, loved his job, and provided Baptist's patients a high level of service, it is unreasonable to conclude that 1.85 FTE radiation oncologists is sufficient to meet the need. Additionally, merely because Baptist has extra capacity and could hire more radiation oncologists does not change the situation as it existed when the CON application was filed – 1.85 FTE radiation oncologists is not sufficient to meet the need.

That Dr. Locken must provide an extraordinary level of service to meet the radiation oncology needs of the area shows just how needy this region is for an additional, radiation oncologist and/or MVRT program. The record shows that Dr. Locken is a unique individual who is irreplaceable in the service area. The service area would likely be looking for more than one radiation oncologist to replace Dr. Locken if and when he is unable to service the community at his current level. Lourdes has thus demonstrated a need in the geographic area. Any other conclusion from the factual findings is not reasonable, not supported by substantial evidence, and constitutes an arbitrary conclusion. Thus, we affirm the Circuit Court inasmuch as it held the Hearing Officer's conclusion on Review Criteria 2 was arbitrary and unsupported by substantial evidence.

**D. Review Criterion 4 – Costs, Economic Feasibility, and**

**Resource Availability**

The Hearing Officer likewise concluded that Lourdes's application

was not consistent with Review Criteria 4 – Costs, Economic Feasibility, and

Resource Availability, which requires that:

> The proposal, when measured against the cost of
> alternatives for meeting needs, shall be judged to be an
> effective and economical use of resources, not only of
> capital investment, but also ongoing requirements for
> health manpower and operational financing[.]

KRS 216B.040(2)(a)2.d.  Additionally, pursuant to the regulations:

> (5) . . . The cabinet shall determine:
>
> > (a) If it is economically feasible for the
> > applicant to implement and operate the
> > proposal; and
> >
> > (b) If applicable, if the cost of alternative
> > ways of meeting the need identified in the
> > geographic area defined in the application
> > would be a more effective and economical
> > use of resources.

900 KAR 6:070, Section 2(5).

Having concluded that Lourdes demonstrated need under Review

Criterion 2, the Circuit Court correctly determined that the Final Order must be

reversed on Review Criterion 4 as the Hearing Officer's conclusion on this point

was based on her erroneous conclusion in Review Criterion 2.  The Final Order on

this point reviewed the costs of Lourdes's proposal and rejected it as not effective and economical "when measured against the cost of the alternative, which is to maintain the status quo[.]" Final Order at 50. Baptist's arguments on appeal mirror this same, arbitrary conclusion. Notably, the Hearing Officer also concluded that "[h]ad need been demonstrated, the alternative posed by [Baptist], that [Lourdes] hire a radiation oncologist without developing its own radiation oncology program, is not reasonable."

We agree with the Circuit Court that Lourdes's application proved a need. Given that the proposed program is cost effective when measured against the alternatives, the Hearing Officer should have found Lourdes's application met Review Criterion 4. KRS 216B.040(2)(a)2.d. Accordingly, we affirm the Circuit Court on this claim.

**CONCLUSION**

For the foregoing reasons we AFFIRM the Circuit Court's Order reversing the Hearing Officer's Final Order and ordering the Hearing Officer to approve Lourdes's application for a CON.

EASTON, JUDGE, CONCURS.

JONES, JUDGE, DISSENTS AND FILES SEPARATE OPINION.

JONES, JUDGE, DISSENTING: Most respectfully, I dissent. As set forth below, I disagree with affirming the Franklin Circuit Court on both the Hearing Officer's

-28-

Findings of Fact and Conclusions of Law and the constitutionality of the State

Health Plan.

### A. *The Hearing Officer's Findings of Fact & Conclusions of Law*

Mercy sought a Certificate of Need ("CON")[8] from the Cabinet of

Health and Family Services ("Cabinet") to establish a radiation therapy center in

Paducah. During the administrative proceedings, Baptist, an interested person,

entered an appearance and objected to issuance of the certificate. Before the

Cabinet, Mercy, the party seeking the CON, bore the burden of proof.

---

[8]  CON laws date back to the 1960s. https://www.ncsl.org/health/certificate-of-need-state-laws (last visited Dec. 20, 2023). "At that time, there was a view that high health care costs were driven largely by wasteful, over-investment in duplicative health care facilities." Maureen K. Ohlhausen, CERTIFICATE OF NEED LAWS: A PRESCRIPTION FOR HIGHER COSTS, ANTITRUST, Vol. 30, No. 1, 50 (Fall 2015). CON laws attempted to curb healthcare costs by preventing overinvestment in and maldistribution of health care facilities by requiring new healthcare entities receive state approval before entering the market or making capital investments. Over the next decade, the United States Congress became convinced that CON laws were necessary to curb rising healthcare costs across the nation. Eventually, Congress decided to incentivize adoption of CON laws by the states through passage of the National Health Planning and Resources Development Act of 1974. *Id.* The 1974 Act made certain federal funding available only to states that had CON laws similar to the federal model in place. *Id.* As a result, all states, except Louisiana, eventually adopted CON laws. Kentucky adopted its CON laws in 1980.

CON laws have been criticized as overly restrictive and a driver of higher health care costs and lower quality care, and the federal mandate was repealed in 1987. In response, several states have modified or entirely repealed their CON laws. At present, only thirty-five states and the District of Columbia still maintain some form of CON program. While Kentucky has revised its CON laws numerous times throughout the years, most recently in 2022, the Kentucky General Assembly has not repealed the statutes.

The Cabinet's Hearing Officer, Maria Mier, conducted a lengthy hearing on Mercy's CON application.[9] Thereafter, the Hearing Officer issued a fifty-two-page Findings of Fact, Conclusions of Law, and Final Order ("Final Order") in which she denied Mercy's CON application because it failed to carry its burden of showing consistency with three of the five statutory review factors.[10] Mercy appealed to the Franklin Circuit Court. Since the Cabinet denied the CON to Mercy, the party who bore the burden of proof, the *McManus* standard governed the Franklin Circuit Court's review below. "Where the fact-finder's decision is to deny relief to the party with the burden of proof or persuasion, the issue on appeal is whether the evidence in that party's favor is so compelling that *no reasonable person could have failed to be persuaded by it*." *McManus v. Kentucky Retirement Systems*, 124 S.W.3d 454, 458 (Ky. App. 2003) (emphasis added).[11]

---

[9] The Hearing Officer heard proof from January 11-15, 2021, and again from January 19-21, 2021.

[10] By statute, the Cabinet must consider several factors when reviewing a CON application: (1) "interrelationships and linkages" to existing care; (2) "costs, economic feasibility, and resources availability"; (3) "quality of services"; (4) "need and accessibility" in the desired geographic area; and (5) "consistency with" the State Health Plan as determined by the Health Services agency. KRS 216B.040(2)(a)2.; 900 KAR 5:020.

[11] *McManus*, a decision from this Court, has been adopted by the Kentucky Supreme Court as correctly setting forth the level of deference due an administrative fact-finding agency when that agency decided against the party who bore the burden of proof. *Kentucky Retirement Systems v. Ashcraft*, 559 S.W.3d 812, 819-20 (Ky. 2018).

> We reaffirm the wisdom and applicability of the *McManus* statement because it properly reflects the deference to be given to the fact-finder. *See* KRS 13B.150(2) ("The court *shall not* substitute its judgment for that of the agency as

-30-

However, citing *Starks v. Kentucky Health Facilities*, 684 S.W.2d 5, 6-7 (Ky. App. 1984), the majority indicates that it applied the lower, substantial evidence standard. While *Starks* correctly set forth the standard applicable to its review, that standard does not apply here. In *Starks*, a CON was issued to Hospital Corporation of America ("HCA") to construct a new hospital facility in Logan County. The appellant, Ronald Starks, a resident of Logan County, Kentucky, filed an appeal challenging the issuance of the CON. Since the party who bore the burden of proof before the administrative agency, HCA, prevailed at the administrative level, the standard of review to be applied by circuit court and this Court was simply one of substantial evidence. As noted above, this was not the case here. Mercy did not prevail at the administrative level, and therefore, the standard of review is one of compelling, not simply substantial, evidence.

---

to the weight of the evidence on questions of fact." (emphasis supplied)). Realistically, there are cases where the record can fairly be read as containing substantial evidence in favor of both sides. However, Kentucky law is clear that the fact-finding agency is charged with making the "call" in those difficult cases and outlining the grounds for the result reached. Simply put, the agency is the decider on issues of fact. Thus, under the *McManus* standard, a court cannot substitute its judgment on those contested issues of fact but if the appealing party has not met his burden of proof with the fact-finder, the court can properly, indeed must, consider whether that party's proof was so compelling that no reasonable person could have failed to be persuaded. If this high standard is met, so is KRS 13B.150(2)(d), which allows for reversal when a final order is "[a]rbitrary, capricious, or characterized by an abuse of discretion."

*Id.*

While substantial evidence plays a role in a second-level *McManus* review, the review is more nuanced than simply searching for substantial evidence or the lack thereof. "In cases such as this where the evidence may, at least at first blush, be perceived to be in equipoise, the *McManus* 'compelling evidence' standard properly breaks the tie." *Bradley v. Kentucky Retirement Systems*, 567 S.W.3d 114, 120 (Ky. 2018). "It does so by implementing the legislative command that the courts 'not substitute [their] judgment for that of the agency as to the weight of the evidence on questions of fact,' KRS 13B.150(2), while outlining an understandable test for determining if the fact-finder was 'arbitrary, capricious or . . . abuse[d] [its] discretion' in violation of KRS 13B.150(2)(d) when assessing the evidence." *Id.*

While the majority's analysis is thoughtful, I believe this is case where the record can fairly be read as containing substantial evidence in favor of both sides, and therefore one where the circuit court should have only reversed if the evidence so overwhelmingly favored Mercy that it compelled a contrary conclusion. *City of Villa Hills v. Kentucky Retirement Systems*, 628 S.W.3d 94, 106 (Ky. 2021). Here, I do not believe that the evidence compelled a contrary conclusion with respect to the three statutory factors at issue. In fact, I believe the evidence overwhelmingly supported Baptist's position, and I am at a loss to see

-32-

how the majority concludes that there was no substantial evidence to support the Hearing Officer's findings of fact and conclusions of law.

The first factor, whether the CON application is consistent with the State Health Plan, is inextricably interwoven with the Franklin Circuit Court's holding that the State Health Plan's 6,000-procedure threshold violates Section 2 of the Kentucky Constitution. Assuming the State Health Plan is constitutional, Mercy failed to present compelling evidence that it would perform at least 6,000 procedures by the second year as the State Health Plan requires.

In its application, Mercy asserted that by year two it would perform 6,603 procedures per year. Before the Hearing Officer, Mercy supported its estimates with expert testimony from Brian Leigh, Engagement Manager, The Chartis Group – Oncology Solutions. Baptist relied on Joseph Spallina, Director, Arvina Croup, LLC. Using a Volume Projection Methodology, Mr. Spallina ran three different models, and he estimated that in all likelihood Mercy's proposed facility would only perform only slightly more than 4,700 procedures by the second year. Given Mr. Spallina's projections, it is impossible to say that the evidence compelled a determination in Mercy's favor with respect to this factor.[12]

_____

[12] In Paragraph 14 of her conclusions of law, the Hearing Officer determined that Mr. Spallina's Model III, which estimated that by the second year Mercy would provide 4,796 treatments to 275 patients, was "the most accurate and reliable way to estimate radiation treatment volumes." It was the Hearing Officer's prerogative to choose which expert witness was the most credible.

The second factor is one of need and accessibility. Both the circuit court and the majority focused heavily on number of physicians currently working at Baptist and on rising cancer rates. First, rising cancer rates do not automatically mean that radiological procedures are rising at the same rate. While Mercy may have submitted evidence that cancer rates are on the rise, Baptist presented countervailing evidence that per patient radiological procedures are trending downwards.

Second, while one can question whether Baptist's physician(s) are overworked, one cannot question the lack of evidence that any patient in the area has been denied care. Additionally, the Baptist facility has the capacity to employ more of its own physicians.[13] Presumably, if Baptist were not able to meet the demand of the patient population with its current physician load, it would simply add a physician. The facility itself, however, appears able to meet the needs of the community in terms of number of procedures needed. And Mercy is seeking the

---

[13] In Paragraph 22 of her conclusions of law, the Hearing Officer explained, "There was ample evidence of record that Dr. Locken is competently handling his case load, that he employs a locums radiation oncologist who works 12 weeks per year, that he has a strong support team in place to efficiently manage the practice, and that Baptist has the resources and experience to seek additional physician support if Dr. Locken is unable to continue his duties. The radiation oncology program maintains qualifications with the Commission on Cancer and the American College of Radiology. There was no evidence presented that there are any barriers or delays to patients seeking radiation therapy and, in fact, the Baptist program is able to and does see patients the same day they are referred, if medically-indicated. The Applicant did not demonstrate that Dr. Locken's high caseload translates to a need for an additional linear accelerator in Paducah."

CON to build an additional facility, not simply to add more physicians. In fact, the Hearing Officer determined that "when taking into account Baptist's hours of operation, the number of days the service operates, and its current volume, [the two linear accelerators at] Baptist [are] [only] operating at approximately 60% capacity."

It is illogical to approve construction of an entire cancer facility – complete with machines and medical and support staff – to address a theoretical concern that the current physicians in the area might be carrying too high of a patient load. This appeal is not about whether Baptist should employ an additional physician to staff its existing radiological center. It is about whether the Paducah area needs an entirely new multi-million-dollar cancer facility. I cannot see how or where that evidence was presented, especially considering that Baptist's current radiological facility is only running at 60% capacity.

The final factor the Hearing Officer concluded Mercy failed to meet concerns costs, economic feasibility, and resource availability. As noted above, the Hearing Officer determined that Baptist's current facility was running at only 60% capacity and did not have a backlog. Mercy projected a total capital expenditure of $11,697,141 to implement its proposed facility. Considering that the radiological needs of the area's patient population are currently being met, and

that Baptist had the capacity to meet any slight increase, the proposed project was not necessary.

> The proposal, when measured against the cost of the alternative, which is to maintain the status quo, is not an effective and economical use of resources. The existing program, which is 2.3 miles away from the proposed program, is currently meeting the area's radiation therapy needs and has the capacity to address the modest patient volume increases projected for the region. An $11.6 million expenditure is not a cost-effective use of resources when there is no identified need for the project.

Final Opinion at p. 50.

I fail to see how the Hearing Officer erred in this regard. Perhaps to run at 100% capacity (if the need to do so ever arises), Baptist would have to hire more staff, including another physician. However, doing so would certainly be more cost effective than spending $11.6 million to construct an entirely new facility.

The majority points out that by year two Mercy anticipates that its facility would charge patients significantly lower fees than Baptist charges its patients for the same cancer-related care. While this may be true, the affordability factor requires a broader view of healthcare. Instead of simply focusing on a specific type of care, the CON's objective is to spread healthcare dollars out making overall care more affordable across the Commonwealth. Given that Baptist is currently meeting the community's needs in terms of cancer-related care,

it was reasonable for the Hearing Officer to conclude that the nearly twelve million dollars Mercy proposed spending on the new center would not positively impact the overall healthcare picture in the Commonwealth enough to justify the expense.

The evidence pointed out by the Franklin Circuit Court and the majority is not without any weight. However, in my opinion, this is a case where there was substantial evidence presented by both sides, and the Hearing Officer decided against the party who bore the burden of proof, Mercy. In such a case, we cannot substitute our judgment for that of the Hearing Officer unless we are able to conclude that the evidence in favor of Mercy was so compelling that reasonable people could not fail to be persuaded by it. Since I cannot say that the evidence compelled a decision in Mercy's favor, I cannot agree with the majority to affirm the Franklin Circuit Court on its review of the three factors at issue. As such, I would reverse and remand this matter to the Franklin Circuit Court for reinstatement of the Cabinet's decision denying Mercy's CON application. *Bradley*, 567 S.W.3d at 125 ("The Board's final decision is plainly supported by substantial evidence and Bradley has failed to meet the *McManus* standard for reversal of the fact-finder's decision. Accordingly, the Court of Appeals was correct in its reversal of the circuit court and remand to that court for reinstatement of the Board's final decision.").

## B. *Constitutionality of State Health Plan*

The procedural posture of this case is somewhat unique in that Mercy filed both an administrative appeal challenging the Cabinet's denial of the CON (discussed above) and a declaratory judgment action challenging the constitutionality of the State Health Plan as part of a single complaint before the Franklin Circuit Court.[14]  Specifically, Mercy challenged Section IV.B of the Plan, which addresses Megavoltage Radiation Equipment and states, in relevant part, "[a]n application for megavoltage radiation therapy services shall be consistent with this Plan if the following criteria are met:  . . .  1.b. the applicant shall demonstrate that sufficient need exists for that program to perform a minimum of 6,000 annual procedures by the end of the second year of operation."  900 KAR 5:020, Section IV.B.1.

The administrative regulation at issue is contained within the State Health Care Plan.  "The State Health Plan is a critical element of the certificate of need process for which the cabinet is given responsibility in KRS Chapter 216B."  900 KAR 5:020E.  "Under Kentucky law, administrative regulations have the full

---

[14]  Since the Cabinet, an administrative agency, has no authority to decide constitutional questions, the constitutional issue was not raised before at the administrative level.  "Exhaustion of administrative remedies is not necessary when attacking the constitutionality of a statute or a regulation as void on its face.  This is because an administrative agency cannot decide constitutional issues.  Thus, to raise the facial constitutional validity of a statute or regulation at the administrative level would be an exercise in futility."  *Commonwealth v. DLX, Inc.*, 42 S.W.3d 624, 626 (Ky. 2001).

force and effect of law when duly enacted and consistent with enabling legislation." *Hughes v. UPS Supply Chain Sols., Inc.*, 677 S.W.3d 273, 280 (Ky. 2023).

"[A] party seeking to have a statute declared unconstitutional is faced with the burden of demonstrating that there is no conceivable basis to justify the legislation." *Holbrook v. Lexmark Int'l Group, Inc.*, 65 S.W.3d 908, 915 (Ky. 2001) (citing *Buford v. Commonwealth*, 942 S.W.2d 909, 911 (Ky. App. 1997)). In this case, **Mercy** bore the burden of proving that no conceivable basis justifies the 6,000-procedure threshold. *Commonwealth v. Howard*, 969 S.W.2d 700, 706 (Ky. 1998) ("[T]he Commonwealth does not have the burden to prove that a statute is constitutional, but rather the one challenging it has such a burden."). Yet, it appears that both the Franklin Circuit Court and the majority placed the burden of proving a rational basis squarely on the shoulders of Baptist and the Cabinet.

For example, the majority states that "notably, by not filing a brief on appeal the Cabinet ostensibly abandoned support of the line it drew." In other words, the majority, like the Franklin Circuit Court, appears to believe that the Cabinet has some affirmative obligation to come forward with evidence to support rationality. This upending of the burden is not supported by our case law. "[T]he Commonwealth has no burden to produce evidence supporting the rationality of any statutory classifications." *Bloyer v. Commonwealth*, 647 S.W.3d 219, 226

(Ky. 2022); *Teco/Perry Cnty. Coal v. Feltner*, 582 S.W.3d 42, 47 (Ky. 2019) (internal quotation marks and citations omitted) ("Furthermore, the General Assembly need not articulate its reasons for enacting the statute, and this is particularly true where the legislature must necessarily engage in a process of line drawing.").

The debate about the efficacy and necessity of CON laws is not one for this, or any, Court to resolve. "The legislature has broad discretion to determine what is harmful to the public health and welfare." *Commonwealth v. Harrelson*, 14 S.W.3d 541, 548 (Ky. 2000). So long as the government exercises its police powers in a constitutional manner, we must apply the law as written, regardless of whether we agree with it philosophically. *Posey v. Commonwealth*, 185 S.W.3d 170, 175 (Ky. 2006). And, to be certain, "[a]mong the police powers of government, the authority to promote and safeguard public health is a high priority." *Lexington Fayette Cnty. Food and Beverage Ass'n v. Lexington-Fayette Urban Cnty. Government*, 131 S.W.3d 745, 749 (Ky. 2004).

"Pertinent to this case, '[w]hen economic and business rights are involved, rather than fundamental rights, substantive due process requires that a statute be rationally related to a legitimate state objective.'" *Beshear v. Acree*, 615 S.W.3d 780, 816 (Ky. 2020) (quoting *Stephens v. State Farm Mut. Auto. Ins. Co.*, 894 S.W.2d 624, 627 (Ky. 1995)). The challenger, in this case, Mercy, has the

burden of proving that the law is not rationally related to a legitimate government purpose. *Id.* "Kentucky courts have always upheld restrictions on property rights that are reasonable, particularly in the all-important area of public health." *Id.* at 816-17. Reasonability is determined not by what any given court believes is fair. Rather, under rationale basis review, a court cannot declare a law unreasonable unless it "imposes burdens without any rational basis for doing so." *Sheffield v. City of Fort Thomas*, 620 F.3d 596, 613 (6th Cir. 2010).

> Indeed,
>
> Courts in this Commonwealth have recognized for half a century that when a "legislative body acts in a purported policy-making or law-making function . . . the concept of what is 'arbitrary' is much more narrowly constricted. . . ." *City of Louisville v. McDonald*, 470 S.W.2d 173, 178 (Ky. 1971). Such an action is only "arbitrary if there is no rational connection between that action and the purpose for which the body's power to act exists. Where the existence of such rational connection is 'fairly debatable' the action will not be disturbed by a court."

*O'Bryan v. Zip Express*, 636 S.W.3d 457, 462-63 (Ky. 2021).

Our General Assembly has explicitly determined that the CON statutes are necessary to make all types of healthcare available throughout the Commonwealth. To this end, KRS 216B.010, provides:

> The General Assembly finds that the licensure of health facilities and health services is a means to insure that the citizens of this Commonwealth will have safe, adequate, and efficient medical care; that **the proliferation of**

> *unnecessary health-care facilities, health services, and major medical equipment results in costly duplication and underuse of such facilities, services, and equipment; and that such proliferation increases the cost of quality health care within the Commonwealth.* Therefore, it is the purpose of this chapter to fully authorize and empower the Cabinet for Health and Family Services to perform any certificate-of-need function and other statutory functions necessary to improve the quality and increase access to health-care facilities, services, and providers, and to create a cost-efficient health-care delivery system for the citizens of the Commonwealth.

*Id.* (emphasis added).

The record reveals that the equipment at issue can provide at least 9,500 procedures annually. Thus, it is a mathematical fact that the 6,000-procedure threshold requires that any newly proposed piece of equipment will be utilized to at least 63% of its capacity by its second year. Certainly, then, the 6,000-procedure threshold is rationally related to the General Assembly's objectives of preventing the overinvestment in and maldistribution of health care facilities in the Commonwealth.

The fact that there are several existing facilities operating under this threshold does not undermine the need for the threshold as the Franklin Circuit Court and the majority suggest. Rather, it does precisely the opposite. If the current facilities are not performing anywhere near their capacity, why would we want to approve the expenditure of millions of limited healthcare dollars on an

already saturated market?  Those same healthcare dollars could be spent on other healthcare needs throughout the state.  *Baptist Convalescent Center, Inc. v. Boonespring Transitional Care Center, LLC*, 405 S.W.3d 498, 506 (Ky. App. 2012).

In sum, it is apparent to me that the 6,000-threshold, while possibly not perfect, is rationally related to a legitimate government interest.  Thus, no matter how this Court may feel about the requirement, we must uphold it.  "So long as the statute's generalization is rationally related to the achievement of a legitimate purpose[,] the statute is constitutional."  *Hunter v. Commonwealth*, 587 S.W.3d 298, 304 (Ky. 2019).

For the reasons set forth above, I cannot agree with the majority that 900 KAR 5:020, Section IV.B.I is unconstitutional.  Therefore, I would reverse the Franklin Circuit Court on this issue.

BRIEFS FOR APPELLANT:

Mathew R. Klein, Jr.
Mark D. Guilfoyle
David M. Dirr
Covington, Kentucky

ORAL ARGUMENT FOR
APPELLANT:

David M. Dirr
Covington, Kentucky

ORAL ARGUMENT FOR
APPELLEE[15] COMMONWEALTH
OF KENTUCKY, CABINET FOR
HEALTH AND FAMILY
SERVICES, OFFICE OF
INSPECTOR GENERAL, DIVISION
OF CERTIFICATE OF NEED:

Olivia M. Peterson
Frankfort, Kentucky

BRIEF FOR APPELLEE,
MERCY HEALTH – LOURDES
HOSPITAL LLC :

Lisa English Hinkle
Christopher J. Shaughnessy
Jonas S. Bastien
Lexington, Kentucky

Edward Monarch
William G. Carroll
Louisville, Kentucky

ORAL ARGUMENT FOR
APPELLEE MERCY HEALTH –
LOURDES HOSPITAL LLC:

Lisa English Hinkle
Lexington Kentucky

Edward Monarch
Louisville, Kentucky

NO BRIEF FILED FOR APPELLEE
COMMONWEALTH OF
KENTUCKY, CABINET FOR
HEALTH AND FAMILY
SERVICES, OFFICE OF
INSPECTOR GENERAL, DIVISION
OF CERTIFICATE OF NEED.

---

[15] Though labeled an "Appellee," counsel for the Cabinet sat with the Appellant during oral argument. The Cabinet neither filed a brief nor presented an argument during oral arguments. The Cabinet was present for oral arguments, though, and responded to questions from the Court.